**ARMOUR AND COMPANY, a Delaware corporation, et al., Plaintiffs-Appellants,**

v.

**B. Dale BALL, Director of the Department of Agriculture of the State of Michigan, and Ronald M. Leach, Acting Chief of the Food Inspection Division of the Michigan Department of Agriculture, Defendants-Appellees,**

**Frank J. Kelley, Attorney General of the State of Michigan, Intervening Defendant-Appellee.**

**No. 72–1016.**

United States Court of Appeals, Sixth Circuit.

Oct. 13, 1972.

Richard B. Foster, Lansing, Mich., for appellants; Foster, Lindemer, Swift & Collins, Lansing, Mich., H. Templeton Brown, Franklin P. Auwarter, William A. Gordon, Mayer, Brown & Platt, Chicago, Ill., on briefs.

Solomon Bienenfeld, Asst. Atty. Gen., Lansing, Mich., Frank J. Kelley, Atty. Gen. of Michigan, Lansing, Mich., Thomas R. Wheeker, Asst. Atty. Gen., on briefs, for appellees.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and THOMAS,* District Judge.

THOMAS, District Judge.

Appellants, Armour and Company, Wilson & Co., Inc., and Geo. A. Hormel & Company, all Delaware corporations, manufacture a variety of sausage and other meat products. They join in an action for declaratory judgment and injunctive relief alleging a conflict of the Federal Wholesome Meat Act (Federal Meat Inspection Act of 1907, as amended), 21 U.S.C. § 601 et seq. (1967) with the Michigan Comminuted Meat Law (M.S.A. 12.964(1) et seq.; M.C.L.A. § 289.581 et seq.) (1952). The two laws will sometimes be designated the Federal Act and the Michigan Law. Appellees are the Director of the Department of Agriculture of the State of Michigan and the Acting Chief of the Food Inspection Division of the Michigan Department of Agriculture. The Attorney General of the State of Michigan is an intervening defendant.

The cause was submitted to the trial court on the complaint, answer, affidavits of officers of Armour and Hormel, a short stipulation, briefs, and oral argument. The trial court denied appellants' motion for summary judgment and granted the motion for summary judgment of the appellees. The meat manufacturers appeal.

In their complaint appellants requested a declaration that "the marking, labeling, packaging, and ingredient provisions" of the Michigan Law are "in addition to, or different than"[1] those imposed under the Federal Act and the regulations issued pursuant thereto and are, therefore, preempted by virtue of 21 U.S.C. § 678 (1967) and Article VI, Clause 2 of the United States Constitution. Appellants also requested the trial court to enjoin appellees from enforcing the provisions of the Michigan Law against them as to "sausage manufactured or processed by plaintiffs which has passed federal inspection."

It is alleged in the complaint and appellees do not deny that

Since December 15, 1967, the effective date . . . of Subchapter I of the Wholesome Meat Act, plaintiffs have prepared all of their sausage, transported and offered for sale in Michigan, at federally inspected establishments in accordance with the requirements of said Act, and of the regulations adopted pursuant thereto; . . . the Secretary of Agriculture has made or caused . . . inspections . . . to be made from time to time by experts of the U.S. Department of Agriculture, both as to raw materials . . . and the finished products, as well as to the factories or

---

\* Hon. William K. Thomas, Judge of the United States District Court, Northern District of Ohio sitting by designation.

1. As here pertinent Section 408 of Title IV of the Wholesome Meat Act (21 U.S.C. § 678) provides "Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under this chapter may not be imposed by any State . . . . ."

plants where such sausage is manufactured, packed or prepared for market. . . .

[I]n June of 1968, a shipment into Michigan of Armour and Company's sausage, which had passed federal inspection, was cited by the Food Inspection Division of that state as not complying with the Michigan . . . Law because of a protein content of less than twelve percent and, as a result, the criminal penalties of Section 10 . . . were invoked against said plaintiff; and that defendants . . . have indicated that they intend to continue . . . [such] . . . policy . . . .

The 1968 prosecution ended with a plea of guilty and a fine. Subsequent to the filing of appellants' complaint on January 13, 1970, prosecutions under the Michigan Law had been commenced by appellees against Armour Dial, Inc., a subsidiary of Armour and Company, and Armour and Company. Both prosecutions are held in abeyance pending the outcome of this case.

## I.

In his opinion and order of November 12, 1971, D.C., 337 F.Supp. 938, the trial court noted:

The plaintiffs attack the Michigan Comminuted Meat Act on the basis of the Federal Wholesome Meat Act, claiming that the federal act entirely preempts the field of meat labeling and ingredient requirements.

Without specifically responding to plaintiffs' claim of preemption the trial court stated:

Plaintiffs . . . may adequately protect their federal rights in a defense to a state prosecution.

Concluding that appellants failed to prove irreparable injury and that they lacked equity or good conscience, the trial court denied appellants' request for injunctive relief. The court ruled further that "reasons which compel this court to deny injunctive relief likewise require denial of plaintiffs' request for declaratory relief." In support of this ruling the court stated:

Generally, the same considerations that require the withholding of injunctive relief will make declaratory relief equally inappropriate. Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L.Ed. 1407 (1943); Samuels v. Mackell, 401 U.S. 66, 91 S.Ct. 764, 27 L.Ed.2d 688 (1971).

■ Samuels v. Mackell, on which the trial court principally relies, is the second in the trilogy of decisions headed by Younger v. Harris, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), and followed by Perez v. Ledesma, 401 U.S. 82, 91 S. Ct. 674, 27 L.Ed.2d 701 (1971). These decisions limit a district court's right to issue federal injunctions against enforcement of state criminal statutes. *Samuels, supra,* applies the *Younger* doctrine to a declaratory action.

[T]he same equitable principles relevant to the propriety of an injunction must be taken into consideration by federal district courts in determining whether to issue a declaratory judgment, and that where an injunction would be impermissible under these principles, declaratory relief should ordinarily be denied as well. 401 U.S. 73, 91 S.Ct. 768.

Lake Carriers' Assn. v. MacMullan, 406 U.S. 498, 92 S.Ct. 1749, 32 L.Ed.2d 257 (1972) whose aid and guidance was not available to the trial court, confirms this limitation of *Younger* and *Samuels.*

[Younger v. Harris and Samuels v. Mackell] were premised on considerations of equity practice and comity in our federal system that have little force in the absence of a pending state proceeding. In that circumstance exercise of federal court jurisdiction ordinarily is appropriate if the conditions for declaratory or injunctive relief are met. See generally Perez v. Ledesma, 401 U.S. 82, 93, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (separate opinion). *Lake Carriers',* 406 U.S. at 509–510, 92 S.Ct. at 1757.

Reasonably read, "a pending state proceeding" means a proceeding under state law that is pending when a complaint is filed in federal court seeking declaratory or injunctive relief from the application of that state law. *Samuels*, therefore, does not forbid declaratory relief in the present case. No state prosecution under the Michigan Law was pending against the appellants when they filed their present action.

*Lake Carriers' Assn., supra,* prescribes the conditions under which a justiciable controversy is presented when a declaratory action is brought to challenge a state law and no criminal prosecution pends thereunder. The Court observes at 406 U.S. 507, 92 S.Ct. at 1755 that since the appellants were obliged under the Michigan Watercraft Pollution Act of 1970 to install sewage storage devices this obligation "in and of itself makes their attack on the validity of the law a live controversy, and not an attempt to obtain an advisory opinion." The Court recognizes

▮f appellants are to avoid prosecution, they must be prepared, according to Michigan authorities, to retain all sewage on board as soon as pump-out facilities are available, which, in turn, means that they must promptly install sewage storage devices. In this circumstance, compliance is coerced by the threat of enforcement, and the controversy is both immediate and real. [Citations] 406 U.S. at 508, 92 S.Ct. at 1756.

▮ In the present case the immediacy and reality of the controversy is plain. Enforcement of the Michigan Law against the appellants is not just a threat. Repetitive enforcement of the law's criminal sanctions is occurring and its continuing enforcement is promised. Applying the test of *Lake Carriers' Assn.* to these circumstances "compliance is coerced by . . . enforcement" and the attack of the meat manufacturers on the validity of the Michigan Law is "a live controversy."

Whether or not the Michigan Law is preempted by the Federal Wholesome Meat Act therefore presents a justiciable controversy that is matured. It requires resolution.

It is concluded, therefore, that the trial court erred in its determination of the inappropriateness of declaratory relief and in refraining from ruling on the appellants' claim of preemption. Because it is concluded that the issue is one of law and prompt adjudication would serve the interest of justice, the Court will proceed to a determination on the merits.

## II.

The Michigan Comminuted Meat Law governs the sale of "meat that has been subjected to a process whereby it has been reduced to minute meat particles." Sausage, by definition, is a comminuted meat and any sausage "which does not meet the specifications of grade 1 sausage" is not permitted to be sold in Michigan. Similarly, the Michigan Law contains specific provisions governing the marking and labeling of sausage. Meat manufacturers or packers must be licensed; and criminal penalties are provided for violations of the law.

The Federal Act and the regulations issued pursuant thereto are applicable, *inter alia,* to meats and meat food products prepared for shipment in "commerce." Sausage, by definition, is a meat food product for which federal regulations provide marking, labeling, and ingredient requirements. The only meat food product involved in this case is sausage; and the claimed conflicts between the Michigan Law and the federal regulations regarding marking, labeling, and ingredient requirements (specifications) constitute the subject matter of this action.[2]

All of appellants' sausage products shipped into Michigan are subject to federal inspection under Subchapter I of the Federal Act. Subchapter I, among its provisions, incorporates the inspec-

---

2. Packaging requirements of the Federal regulations are not an issue in this case.

tion and labeling provisions of the Federal Meat Inspection Act of 1907, 21 U.S.C. § 601 et seq. The subchapters of the Wholesome Meat Act strengthen but also expand the Meat Inspection Act.

Under Subchapter I, 21 U.S.C. § 601(n)(7) a meat food product is misbranded

if it purports to be or is represented as a food for which a definition and standard of identity or composition has been prescribed by regulations of the Secretary under section 607 of this title unless (A) it conforms to such definition and standard, and (B) its label bears the name of the food specified in the definition and standard . . . .

Title 21 U.S.C. § 607 provides:

The Secretary, whenever he determines such action is necessary for the protection of the public, may prescribe . . . (2) definitions and standards of identity or composition for articles subject to this subchapter [Subchapter I] . . . .

The regulations promulgated by the Secretary must be "necessary for the protection of the public." The Secretary is further governed by one of the congressional findings that

It is essential in the public interest that the health and welfare of consumers be protected by assuring that meat and meat food products distributed to them are wholesome, not adulterated, and properly marked, labeled, and packaged. 21 U.S.C. § 602.

Guided by this legislative policy the Secretary is authorized to prescribe standards of identity or composition for sausage, and such sausage is misbranded unless it conforms to such definition and standard and its label bears the name of the food specified in the definition and standard.

In Federal Security Administrator v. Quaker Oats Co., 318 U.S. 218, 221–222, 63 S.Ct. 589, 87 L.Ed. 724 (1943), the Supreme Court upheld a regulation of the Administrator which established a "definition and standard of identity" for farina. Significantly, the Federal Food, Drug, and Cosmetic Act provided that any food which

purports to be or is represented as a food for which a definition and standard of identity has been prescribed . . . is . . . misbranded unless (1) it conforms to such definition and standard, and (2) its label bears the name of the food specified in the definition and standard . . . .

Those provisions are, in substance and intent, the same as the provisions enacted in the Federal Wholesome Meat Act. The language is nearly identical.

Moreover, 21 U.S.C. § 607(c) states "definitions and standards of identity or composition for articles subject to this subchapter . . . not inconsistent with any such standards established under the Federal Food, Drug, and Cosmetic Act . . . ." By directly referring to that Act, it is concluded that Congress intended to give to the phrase "definitions and standards of identity or composition" a meaning as broad as that given to the phrase "definition and standard of identity" as construed in *Quaker Oats, supra.* Moreover, Congress has added to the phrase "definition and standard of identity" the words "or composition." Giving ordinary meaning to the word "composition," it means the resulting product of mixing or combining various elements or ingredients. With this construction, the statute gives the Secretary the authority to prescribe "definitions and standards of *composition*" for meat food products. (Emphasis supplied.)

What the Supreme Court said in *Quaker Oats, supra,* 230, 63 S.Ct. 596, of those provisions in the Federal Food, Drug, and Cosmetic Act is equally applicable to the like provisions in the Wholesome Meat Act.

But it was found that such a prohibition [false and misleading labeling] was inadequate to protect the consumer from "economic adulteration", by which less expensive ingredients were

substituted, or the proportion of more expensive ingredients diminished, so as to make the product, although not in itself deleterious, inferior to that which the consumer expected to receive when purchasing a product with the name under which it was sold. . . . The remedy chosen was not a requirement of informative labeling. Rather it was the purpose to authorize the Administrator to promulgate definitions and standards of identity "under which the integrity of food products can be effectively maintained" . . . .

■ Thus, it is concluded that one purpose of the Wholesome Meat Act is to empower the Secretary to adopt definitions and standards of identity or composition so that the "integrity" of meat food products could be "effectively maintained." Indeed, Congress in a further finding declares that,

> Unwholesome, adulterated, or misbranded meat or meat food products impair the effective regulation of meat and meat food products in interstate or foreign commerce . . . . (21 U.S.C. § 602.)

The remedy chosen is not merely to prevent false and misleading labeling but to set standards under which the integrity of meat food products would be assured. Under the statutory scheme then, it is essential that the Secretary establish standards of identity or composition. Without such standards it would be impossible to carry out the express congressional policy.

As a further part of the statutory scheme the authority delegated to the Secretary to prescribe "definitions and standards of identity or composition" for meat food products includes the authority to prescribe their "ingredients." Prescribing the "ingredients" is essential to determine the "identity" of the finished product and to protect the consumer from "economic adulteration." Moreover, in defining and standardizing the composition (ingredients) of the product the Secretary of necessity must regulate the product's nutritional value.

■ It is concluded further that the phrase "definitions and standards of identity or composition" is the functional equivalent of the term "ingredient requirements" contained in 21 U.S.C § 678. (See n. 1 infra.)

It is stipulated that the Federal Act and the Michigan Law "have a common purpose of protecting public health." However, the definitions and standards of identity or composition (ingredient requirements) established by the Secretary [3] conflict in many material instances with the "specifications" (ingredient requirements) for Grade 1 sausage provided in the Michigan Law. While those conflicts are detailed in the Appendix, the major conflicts, in summary form, are now discussed.

Grade 1 sausage, to be legally saleable in Michigan, must consist only of striated muscle, including head and cheek meat (basically, skeletal meats) derived only from the carcass of any cattle, swine, or sheep, or a mixture of such meats. Sausage, as defined by the regulations, may be prepared from *any part* of cattle, sheep, swine, or goats capable of use as human food. Thus, sausage under the regulations may contain meat other than skeletal meat and may also contain goat meat.

The regulations permit up to 15% of poultry meats or poultry products in "Cooked, Smoked Sausage," whereas under the Michigan Law neither ingredient is permissible in Grade 1 sausage. Likewise, under the regulations beef and/or pork fatty tissue not exceeding 15% are permitted ingredients in "Cooked, Smoked Sausage" but neither is permitted under the Michigan Law. Cereal and soya binders or extenders and certain "milk" additives permitted

3. Regulations promulgated by the Secretary, effective December 1, 1970, 35 Fed. Reg. 15,552, 9 C.F.R. 301 et seq. revise earlier regulations in effect when appellants filed their complaint on January 13, 1970.

under the regulations are excluded ingredients under the Michigan Law. However, the "milk" additives permitted under the Michigan Law may amount to 4% of the total ingredients, while under the regulations "milk" additives may not exceed 3.5%. Additionally, the "trimmable fat" content of specified sausages differs. (See Appendix.)

Finally, under the Michigan Law a "protein content" of 12% is required while under the regulations no percentage of protein content is specified. In effect, however, a "protein content" of 11.2% is required. (See Appendix.)

An item-by-item comparison discloses that nearly all provisions in the Michigan Law conflict with the corresponding provisions in the Secretary's regulations. This conflict presents the preemption issue.

Appellees attempt to avoid preemption by earnestly arguing "since Congress enacted only minimum standards, the states were free to enact higher standards."

Entered only for the purpose of plaintiffs' motion, the parties stipulated:

The minimum nutritional requirements of the Michigan . . . Law are higher than the minimum nutritional requirements of the Federal Wholesome Meat Act.

The trial court misinterpreted this stipulation when he found

Plaintiffs have stipulated that the standards established under the Federal Wholesome Meat Act are minimum standards, not maximum.

The outer limits of the stipulation were set in a colloquy between court and counsel during oral argument. When the court asked counsel whether it was "equitable . . . that the people . . . of Michigan should have the quality of their meat reduced . . ." counsel answered,

Now, if you want to get into that question, I think we should take proof on it.

Counsel supplemented this by adding,

. . . if there is a question aside from higher nutritional requirements . . . rather than have the court come to certain conclusions with respect to whether this is good or whether that is bad, that is a matter of scientific proof, and if the Court is going to consider that aspect of it, we would like the opportunity to present proof on that.

Thus, appellants did not stipulate that the "quality" or "wholesomeness" of their sausage was inferior. They merely stipulated that the Michigan nutritional requirements, presumably the protein requirement, was higher than under the Federal Act. They isolated that fact so the court could determine whether this and other conflicting Michigan provisions were preempted by the Federal Act.

Not as to other conflicts where the Federal regulations are more demanding, but as to Michigan's requirement of 12% protein content the trial court was correct when he stated "compliance with the Michigan Act is compliance with the Federal Act." Moreover, were there no other ingredient requirement in the regulations compliance with the Michigan 12% requirement would obviously comply with the 11.2% resulting federal requirement. However, the Secretary, by prescribing maximum percentages of other ingredients in sausage has, in effect, established that the percentage of protein may be less than 12% (actually 11.2%). The only way to achieve Michigan's 12% protein requirement is to diminish the permissible percentages of other ingredients. To do so, however, would allow Michigan or any other state to interfere with the permissible percentage of ingredients which the Secretary, under the Federal Act, is entitled to prescribe. That is the very situation which Congress sought to prevent.

The Michigan protein requirement may be from the consumer's point of view a beneficial and wholesome requirement. Nevertheless, in *Quaker Oats, su-*

*pra*, 318 U.S. 232, 63 S.Ct. 597, the Supreme Court expressly ruled that a federal regulation may exclude an ingredient from a food product even though beneficial and wholesome.

We must reject at the outset the argument earnestly pressed upon us that the statute does not contemplate a regulation excluding a wholesome and beneficial ingredient from the definition and standard of identity of a food. The statutory purpose to fix a definition of identity of an article of food sold under its common or usual name would be defeated if producers [states] were free to add ingredients, however wholesome, which are not within the definition.

Hence, the protein content implied in the regulations is valid and enforceable even though it has the effect of reducing an ingredient requirement that may result in higher nutritional value for a meat food product. It is equally true that the congressional purpose to standardize identity and composition of meat food products would be defeated if states were free to require ingredients, however wholesome, which are not within the Secretary's standards.

The Federal Act itself manifests a congressional intent to prescribe uniform standards of identity and composition. This intent is expressed in 21 U.S.C. § 601(n)(7) which defines as misbranded a meat food product in "commerce" which does not conform to the Secretary's standards of identity or composition. If the meat food product does not conform with the regulations then it is misbranded irrespective of where in "commerce" it may be transported. Thus, appellee's contention "that Congress did not intend to establish uniform national standards of identity for meat food products" is refuted by the express language of the Act itself.

### III.

The keystone conclusion of the trial court that the Federal Act establishes only minimum requirements will now be tested by determining whether 21 U.S.C. § 678 is preemptive.

Thus, the ultimate issue is whether the marking, labeling, and ingredient provisions of the Michigan Law are in addition to, or different than the Secretary's regulations governing sausage and, whether the provisions of the Michigan Law can be enforced against meat food products (sausage) prepared by appellants for shipment in "commerce" and their consequent sale in Michigan.

In considering the application of the Supremacy Clause, Florida Lime & Avocado Growers, Inc. v. Paul, Dir. Dept. of Agriculture of Calif., 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), specifies two preemption tests:

The principle to be derived from our decisions is that federal regulation of a field of commerce should not be deemed preemptive of state regulatory power in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained. See, *e. g.*, Huron Portland Cement Co. v. Detroit [362 U.S. 440, 80 S.Ct. 813, 4 L. Ed.2d 852 (1960)].

The federal regulations concerning sausage cannot be separately tested against each corresponding ingredient requirement of the Michigan Law that fixes a higher standard. The Secretary's definitions and standards of identity or composition relate to finished products and are unitary. Each ingredient requirement is dependent upon the other requirements. The interdependent nature of these uniform national standards precludes applying the first preemption test. The second test of preemption does apply to these higher Michigan ingredient requirements. In 21 U.S.C. § 678 "Congress has unmistakably so ordained" federal regulation of a field of commerce. That section's preemptive language provides:

Marking, labeling, packaging, or ingredient requirements in addition to, or different than, those made under

this chapter may not be imposed by any State . . . with respect to articles prepared at any establishment under inspection in accordance with the requirements under subchapter I of this chapter . . . .

It is apparent that this language does not designate that the federal standards prescribed by the Secretary in fixing ingredient requirements shall only be minimum standards. On the contrary, under the clear wording of Section 678 "marking, labeling . . . or ingredient requirements" imposed by a state would be "in addition to, or different than [those made by the Secretary]" whether the state "marking, labeling . . . or ingredient requirements" are lower or higher than the corresponding requirements made by the Secretary under the Federal Act. Thus, by prohibiting a state's imposition of "marking, labeling . . . or ingredient requirements" which are "in addition to, or different than [those made by the Secretary]," Congress has "unmistakably . . . ordained" that the Federal Act fixes the sole standards. The Michigan Law's specifications of Grade 1 sausage are preempted by the federal regulations because they prescribe standards that are "in addition to, or different than, those made" by the Secretary under the regulations pertaining to sausage.

The remaining language of Section 678 corroborates that Congress has unmistakably ordained that "marking, labeling . . . or ingredient requirements" prescribed by the Secretary completely preempt this field of commerce. After banning a state's imposition of additional or different "requirements," Section 678 continues:

[B]ut any State . . . may, consistent with the requirements under this chapter, exercise concurrent jurisdiction with the Secretary over articles required to be inspected under said subchapter I, for the purpose of preventing the distribution for human food purposes of any such articles which are adulterated or misbranded

and are outside of such an establishment . . . .

The concurrent action of a state, permitted by this language, only applies to adulterated or misbranded articles. These words are necessarily used as defined in the Act. Under U.S.C. § 601(n)(7) a meat food product is misbranded

if it purports to be or is represented as a food for which a definition and standard of identity or composition has been prescribed by regulations of the Secretary under section 607 of this title unless (A) it conforms to such definition and standard . . . .

Permissible concurrent enforcement by a state under Section 678 would apply only to meat food products that satisfy this definition of misbranding. In its concurrent enforcement a state would not be permitted to prevent the distribution in commerce of any article that "conforms" to the "definition and standard of identity or composition." Thus, Congress is ordaining uniform national ingredient requirements prescribed by the Secretary.

The last sentence of Section 678 adds further corroboration.

This chapter shall not preclude any State . . . from making requirement or taking other action, consistent with this chapter, with respect to any other matters regulated under this chapter.

By permitting state action "with respect to any other matters regulated under this chapter," Congress is unmistakably ordaining that a state may not take action with reference to "marking, labeling, . . . or ingredient requirements in addition to, or different than, those made under this chapter . . . ." State requirements must be "consistent" with the Federal Act.

Congressional debates are devoid of any discussion of Section 408 of the Act (21 U.S.C. § 678). However, in view of its unambiguous language, Section 408

reflects unequivocal legislative purpose to make the Federal Act preemptive.

This assessment of congressional intent is reinforced by later congressional action in amending the Poultry Products Inspection Act, 21 U.S.C. § 467e (1968). The amendment added the precise preemptive language of Section 678 of the Federal Wholesome Meat Act. It is significant that this occurred after the Second Circuit in *Swift & Co. v. Wickham,* 364 F.2d 241 (2 Cir. 1966), cert. den. 385 U.S. 1036, 87 S.Ct. 776, 17 L. Ed.2d 683 (1967), held that the Poultry Products Inspection Act did not preclude the State of New York from imposing labeling requirements for turkey in addition to and different than those requirements by the Federal Act. Compare, *Meat Trade Institute, Inc. v. Mc-Laughlin, Comm'r.* (1971), 37 A.D.2d 456, 326 N.Y.S.2d 683.

By the second preemption test of *Florida Avocado Growers, supra* the Michigan labeling requirements are preempted. Indeed, even under the first preemption test the labeling requirements are preempted; and the State of Michigan so concedes. Since the federal regulations make no provision for Grade 1 sausage, or for labeling sausage Grade 1, it is manifest that "the nature of the [federally] regulated subject matter permits no other conclusion."

The congressional history preceding the passage of the Federal Act discloses that these debates principally involved Subchapter III, federal-state cooperation, a pioneer program instituted by the Act. There is a clear expression of congressional intent to limit federal action under Subchapter III (21 U.S.C. § 661 et seq.) to situations in which a state has failed to develop or is not enforcing "requirements at least equal to those imposed under subchapter I and IV of this chapter." This limitation applies only to Subchapter III.

Moreover, congressional debates also make clear that if conditions warrant the Secretary may exercise authority under Subchapter III over the slaughter of animals that are prepared for use as human food solely for distribution within the state. Otherwise, the authority of the Secretary under the Act extends only to the described activities that are "in commerce." Hence, under Subchapter III the State of Michigan may continue to enforce the Michigan Law as to meat food products prepared in Michigan solely for distribution in the State as long as its law and its enforcement imposes requirements at least equal to those imposed under Subchapters I and IV of the Federal Act.

Michigan's desire to preserve from preemption its Comminuted Meat Law, a law that has protected consumers since its enactment in 1952, is understandable. Nevertheless, in view of the clear and complete preemption ordained by Congress, this Court must enforce the Supremacy Clause and declare that the Federal Act preempts certain provisions of the Michigan Law. It is determined and declared that as to the transportation and sale "in commerce" of meat food products described in regulations, 9 C.F.R. §§ 319.140; 319.141; 319.142; 319.143; 319.144; 319.180; and 319.181 the marking, labeling, and ingredient requirements of the federal regulations preempt the following provisions of the Michigan Law: Section 12.-964(2), Sec. 2(a)(1), M.C.L.A. § 289.-582(a)(1), except for the last two sentences (added by amendment in 1968); Sec. 2(a)(2); (Section 12.964(3), M.C.L.A. § 289.583; Section 12.964(4), M.C.L.A. § 289.584; Section 12.964(5), M.C.L.A. § 289.585; Section 12.964(7), M.C.L.A. § 289.587; Section 12.964(8), M.C.L.A. § 289.588; and Section 12.964(10), M.C.L.A. § 289.590.

The judgment of the District Court is reversed and the cause is remanded for further proceedings not inconsistent with this opinion.

## APPENDIX

1. M.S.A. § 12.964(2)(a), M.C.L.A. § 289.582(a), provides that "Grade 1 sau-

sage shall consist only of skeletal fresh meat prepared from the animal carcass of cattle, swine or sheep or a mixture of such meats, or the striated muscle of chicken or turkey . . . ."

2. Skeletal meat is defined as "any clean edible part of striated muscle including head meat and cheek meat." M.S.A. § 12.964(1)(i), M.C.L.A. § 289.-581(i). Meat is defined as "the properly dressed, clean, sound flesh derived from cattle, swine or sheep . . . ." M.S.A. § 12.964(1)(h), M.C.L.A. § 289.-581(h). A carcass is "the commercially prepared or dressed body of any cattle, sheep or swine." M.S.A. § 12.964(1)(g), M.C.L.A. § 289.581(g).

3. A meat food product is "any article capable of use as human food which is made wholly or in part from any meat or other portion of the carcass of any cattle, sheep, swine, or goats . . . ." 9 C.F.R. § 301.2(vv). Carcass is defined as "all parts, including viscera, of any slaughtered livestock." 9 C.F.R. § 301.2(ss). However, 9 C.F.R. § 318.6 prohibits as ingredients in meat food products intestines and certain other named internal organs.

4. Meat is defined as "The part of the muscle of any cattle, sheep, swine, or goats, which is skeletal or which is found in the tongue, in the diaphragm, in the heart, or in the esophagus . . . . It does not include the muscle found in the lips, snout or ears." 9 C.F.R. § 301.2(tt).

5. A meat byproduct is "Any part capable of use as human food, other than meat, which has been derived from one or more cattle, sheep, swine, or goats." 9 C.F.R. § 301.2(vv).

Thus, the Michigan Law requires, basically, skeletal-type meat in Grade 1 sausage whereas the regulations permit the use of internal organs, with specific exceptions, meat by-products and meat as ingredients in sausage.

6. While the Michigan Law, M.S.A. § 12.964(2)(a), M.C.L.A. § 289.582(a) permits the sale of Grade 1 sausage prepared only from the striated muscle of chicken or turkey, subsections (f), (g), and (h) do not permit chicken or turkey to be added as an ingredient to any other sausage. By contrast, however, the regulations defining Cooked, Smoked Sausage (9 C.F.R. § 319.180) permits frankfurters, bologna and similar sausages to contain "poultry products which, individually or in combination, are not in excess of 15 percent of the total ingredients excluding water, in the sausage." Poultry products include chicken or turkey meat, skin, fat, gizzard and the heart or liver of a chicken or turkey. Sec. 7 C.F.R. § 81.1.

7. The regulation governing Cooked, Smoked Sausage (9 C.F.R. § 319.180) permits the use of partially defatted beef and/or pork fatty tissue "in an amount not exceeding 15 percent of the meat and meat byproduct ingredients." Partially defatted beef and pork fatty tissue are beef and pork by-products. 9 C.F.R. §§ 319.1(e) and 319.29(a).

8. Because the Michigan Law defines Grade 1 sausage as consisting "only of skeletal fresh meat" the statute by definition precludes the use of beef and pork byproducts, poultry and poultry products, and goat meat and goat meat byproducts. However, under the regulations they are permissible ingredients.

The Michigan statute prohibits the use in Grade 1 sausage of: "Heart, tongue, liver cracklings [cooked rind] or crackling meal, tripe [stomach], lungs, melts [spleen], eyes, stomachs, weasand meats [windpipe, esophagus, or throat], udder, lips, ears or snouts." M.S.A. § 12.964(2)(a)(2), M.C.L.A. § 289.582(a)(2). Because sausage is defined as a "meat food product" prepared in part from "meat byproducts" and because a "meat byproduct" is defined as "any part capable of use as human food, other than meat" all of the above-mentioned articles would be, under the regulations, permissible ingredients in sausage.

9. The Michigan Law permits the addition to Grade 1 sausage of water or ice, if not excessive. The amount is unspecified. M.S.A. § 12.964(2)(a), M.C.L.A. § 289.582(a). However, the statute limits the overall moisture content in the finished product to 65%. M.S.A. § 12.-964(2)(a)(1), M.C.L.A. § 289.582(a)(1). The regulation also permits the addition of water or ice but limits the amount of such water or ice to "an amount not to exceed 3 percent of the total ingredients." 9 C.F.R. § 319.140. However, if the sausage is Cooked, Smoked Sausage (9 C.F.R. § 319.180) it "shall contain no more than 10 percent of added water." The Michigan Law requires a "protein content of 12 percent." M.S.A. § 12.964(2)(a)(1), M.C.L.A. § 289.582(a)(1).

There is no federal regulation governing overall moisture or protein content. Appellants and the United States Government, in an *amicus* brief, advance a formula, unchallenged by the appellees that permits computation of moisture and protein content. For Cooked, Smoked Sausage, 9 C.F.R. § 319.180, this section fixes a maximum of 30% fat, and 10% added water. Curative agents, condiments, and binders or extenders add 4%. This leaves 56% moisture and protein. Applying a ratio recognized by the Department of Agriculture of 4:1 moisture to protein, protein totals 11.2% and overall moisture totals 54.8%.

If Cooked, Smoked Sausage is "all meat" or "all species" sausage then 9 C.F.R. § 319.180 allows a maximum of 30% fat, 10% added water, minimal amounts of condiments or curing agents but no binders or extenders. *Cf.* Federation of Homemakers v. Butz, 466 F.2d 462 (C.A.D.C.1972). Applying the same ratio, protein totals 12% and overall moisture 58%.

10. The Michigan Law limits the amount of "non-fat dry milk solids or dry whole milk" to 4 pounds per 100 pounds of sausage. M.S.A. § 12.964(2)(a)(1), M.C.L.A. § 289.582(a)(1). The regulations classify nonfat dry milk, calcium reduced skim milk and dried milk as binders or extenders. 9 C.F.R. § 319.140. All sausage in which binders or extenders are permitted "shall contain no more than 3.5 percent" binders or extenders. 9 C.F.R. § 319.140. Binders or extenders are permitted in Sausage Generally (9 C.F.R. § 319.140), Breakfast Sausage (9 C.F.R. § 319.143) and Cooked, Smoked Sausage (9 C.F.R. § 319.180).

11. Under the Michigan Law, "trimmable fat" permitted in pork, breakfast or roasted sausage may not exceed 45%. M.S.A. § 12.964(2)(a)(1), M.C.L.A. § 289.582(a)(1). The regulations, however, permit Fresh Pork, Breakfast and Smoked Pork Sausage to contain "trimmable fat" in an amount not to exceed 50%. 9 C.F.R. §§ 319.141, 319.143 and 319.160.

12. M.S.A. § 12.964(2)(a), M.C.L.A. § 289.582(a), permits the addition of "sodium or potassium nitrate, sodium or potassium nitrite, ascorbic acid, or the salts thereof" to Grade 1 sausage but in unspecified amounts. The regulations, while permitting the use of those chemical substances, limits the amount of such chemicals. 9 C.F.R. § 318.7(c)(4).

13. The Michigan Law permits the addition of "eggs or egg products, chives, tomatoes, parsley, peppers, onions, garlic, [and] celery" to Grade 1 sausage. The regulations make no provision specifically allowing those substances to be added to any sausage. 9 C.F.R. §§ 319.140–319.181. However, it seems to be conceded that chives, parsley, peppers, onions and garlic are flavoring agents and thus proper ingredients of sausage. Eggs or egg products, tomatoes and celery are not specified by the regulations as permissible ingredients in sausage. Even though the Michigan Law does not *require* their addition, a conflict exists to the extent that they are permitted ingredients.

14. The Michigan Law provides that Pork, Breakfast and Roasted Sausage "shall not contain added water or ice." The regulations, on the other hand, permit Pork and Breakfast Sausage to con-

tain water or ice not to exceed 3% of the total ingredients used. 9 C.F.R. §§ 319.141 and 319.143.

15. The Michigan Law prohibits the addition of artificial and vegetable coloring to sausage (M.S.A. § 12.964(2)(a)(2), M.C.L.A. § 289.582(a)(2), while the regulations permit the use of coloring matter and dyes if approved by the Administrator. 9 C.F.R. § 319.7(a)(2).

16. Under the Michigan Law "No product shall be sold as sausage . . . which is not graded . . . [Grade 1] and which does not meet the specifications for grade 1 sausage." M.S.A. § 12.964(3), M.C.L.A. § 289.583. By contrast, however, there is no regulation requiring or permitting a sausage product to be labeled Grade 1.

17. M.S.A. § 12.964(4), M.C.L.A. § 289.584, requires the name and address of the manufacturer to be plainly marked on each package. However, 9 C.F.R. § 317.2(c)(3) permits the name and place of business of the manufacturer, packer or distributor. Alternately the phrase "Prepared by" or "Distributed for" may be used. 9 C.F.R. § 317.-2(g)(1).

18. M.S.A. § 12.964(4), M.C.L.A. § 289.584, requires the name and address of the manufacturer to be affixed at least once per pound to smaller varieties of sausage. The regulations, however, permit the name and address of the manufacturer, packer or distributor to be affixed "on each 2 pounds of product." 9 C.F.R. §§ 316.10(b) and 317.-2(g).

19. M.S.A. § 12.964(5), M.C.L.A. § 289.585, provides "all [sausage] products . . . may be sold in colored artificial casings . . . [p]rovided [t]hat no such products shall be sold in colored natural casings." However, 9 C.F.R. § 319.7(c)(3) does permit coloring matter and dyes to be applied to natural casings, if approved by the Administrator in specific cases.