**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ASSOCIATION DES ÉLEVEURS DE
CANARDS ET D'OIES DU QUÉBEC, a
Canadian nonprofit corporation;
HVFG, LLC, a New York limited
liability company; HOT'S
RESTAURANT GROUP. INC., a
California corporation,
            *Plaintiffs-Appellees*,

v.

XAVIER BECERRA, Attorney General,
            *Defendant-Appellant.*

No. 15-55192

D.C. No.
2:12-cv-05735-
SVW-RZ

OPINION

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted December 7, 2016
Pasadena, California

Filed September 15, 2017

Before: Harry Pregerson, Jacqueline H. Nguyen,
and John B. Owens, Circuit Judges.

Opinion by Judge Nguyen

**SUMMARY**[*]

**Preemption / Poultry Products Inspection Act**

The panel reversed the district court's grant of summary judgment in favor of plaintiffs who challenged California Health and Safety Code § 25982, a provision that bans the sale of products made from force-fed birds, such as foie gras; vacated the district court's permanent injunction; and remanded for further proceedings.

The panel rejected plaintiffs' express preemption argument - that California's sales ban was expressly preempted because the Poultry Products Inspection Act ("PPIA") prohibited states from imposing "ingredient requirements" that were "in addition to, or different than," the federal law and its regulations. 21 U.S.C. § 467e. The panel held that section 25982 was not expressly preempted. Specifically, the panel held that the ordinary meaning of "ingredient" and the purpose and scope of the PPIA made clear that "ingredient requirements" pertain to the physical components that comprise a poultry product, not animal husbandry or feeding practices.  The panel held that California law did not impose a preempted ingredient requirement, and section 25982 was not preempted by the PPIA even if it functioned as a total ban on foie gras.

The panel also rejected plaintiffs' arguments that the PPIA impliedly preempted section 25982 under the doctrines of field and obstacle preemption. First, under the

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

doctrine of field preemption, states are precluded from regulating conduct in a field that Congress has determined it will regulate. The panel held that because the PPIA itself contemplated extensive state involvement, Congress clearly did not intend to occupy the field of poultry products. Second, obstacle preemption occurs where state law stands as an obstacle to the purposes and objectives of Congress. The panel held that plaintiffs failed to explain how section 25982 stood as an obstacle to the PPIA's objectives of ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451.

## COUNSEL

Aimee Feinberg (argued), Deputy Solicitor General; Peter H. Chang, Deputy Attorney General; Constance L. LeLouis, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Edward C. DuMont, Solicitor General; Xavier Becerra, Attorney General; Office of the Attorney General, Sacramento, California; for Defendant-Appellant.

Michael Tenenbaum (argued), The Office of Michael Tenenbaum, Santa Monica, California, for Plaintiffs-Appellees.

Bruce A. Wagman, Schiff Hardin LLP, San Francisco, California; Melissa Grant and Arnab Banerjee, Capstone Law APC, Los Angeles, California; for Amici Curiae Humane Society of the United States, Humane Society Veterinary Medical Association, Animal Legal Defense Fund, Farm Sanctuary Inc., Marin Humane Society, and Mercy for Animals.

**OPINION**

NGUYEN, Circuit Judge:

In 2004, California passed legislation to prohibit the practice of force-feeding ducks or geese to produce foie gras, an expensive delicacy made from their liver. California determined that the force-feeding process, which typically involves inserting a 10- to 12-inch metal or plastic tube into the bird's esophagus to deliver large amounts of concentrated food, is cruel and inhumane. The state therefore prohibited force-feeding a bird "for the purpose of enlarging the bird's liver beyond normal size," Cal. Health & Safety Code § 25981, as well as the in-state sale of products made elsewhere from birds force-fed in such a manner, *id.* § 25982. The legislation does not ban foie gras itself, but rather the practice of producing foie gras by force-feeding. California provided a grace period of over seven and a half years for producers to transition to alternative methods of producing foie gras. *Id.* § 25984.

On July 2, 2012, the day after the state law took effect, Plaintiffs sued the state of California, challenging only Health and Safety Code section 25982, the provision that bans the sale of products made from force-fed birds. Plaintiffs initially argued that the sales ban violates the Due

Process and Commerce Clauses of the U.S. Constitution. After these claims were dismissed, Plaintiffs amended their complaint to allege that the federal Poultry Products Inspection Act (the "PPIA"), which has been on the books for over fifty years, preempts the state provision. The district court concluded that section 25982 is expressly preempted by the PPIA and granted Plaintiffs summary judgment. We reverse and remand.

## I. BACKGROUND

Plaintiffs Hudson Valley Foie Gras and the Association des Éleveurs de Canards et d'Oies du Québec raise birds for slaughter and produce foie gras at their facilities in New York and Quebec, respectively; Plaintiff Hot's Restaurant Group is a restaurant in California that sells foie gras.

The foie gras products that Plaintiffs make and sell are produced by force-feeding birds to enlarge their livers. From the day they hatch, the birds undergo a regimented feeding process that lasts for about eleven to thirteen weeks. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris* (*Canards I*), 729 F.3d 937, 942 (9th Cir. 2013). For the first few months, the birds are fed various pellets that are made available to them twenty-four hours a day. *Id.* Then, for a two-week period, the feeding pellets are available only during certain times of the day. *Id.* In the final stage of the feeding process, which lasts up to thirteen days, the birds are force-fed in a process called *gavage*, during which feeders use "a tube to deliver the feed to the crop sac at the base of the duck's esophagus." *Id.*

### A. California's Force-Feeding Ban

In 2004, the California state legislature enacted a statutory framework to end the practice of force-feeding

birds to fatten their livers. Cal. Health & Safety Code §§ 25980–25984. Section 25981 makes it illegal to force-feed a bird "for the purpose of enlarging the bird's liver beyond normal size." Section 25982, the only provision challenged in this case, prohibits selling a product "in California if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size." A "bird" is defined to include a duck or a goose, *id.* § 25980(a), and "force-feeding" is defined as a process by which a bird consumes more food than it would typically consume voluntarily, conducted through methods such as "delivering feed through a tube or other device inserted into the bird's esophagus," *id.* § 25980(b).

California's law was designed to rectify what the state considered an inhumane feeding practice. *See* 2004 Cal. Legis. Serv. Ch. 904 (S.B. 1520) (Legislative Counsel's Digest) (seeking to establish provisions for force-feeding birds similar to those already in place for "keeping horses or other equine animals"). According to the legislative analysis of the law, force-feeding commonly requires a worker to hold the bird between her knees, grasp the bird's head, insert a 10- to 12-inch metal or plastic tube into the bird's esophagus, and deliver large amounts of concentrated meal and compressed air into the bird. *See, e.g.*, Cal. Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 4–5 (June 20, 2004); Cal. Sen. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 5–6 (May 6, 2004). The bird is force-fed up to three times a day for several weeks and its liver grows to ten times the size of a normal liver. Cal. Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 5 (June 20, 2004). This process is apparently "so hard on the birds that they would die from the pathological damage it inflicts if they weren't slaughtered first." Cal.

Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 2 (Aug. 17, 2004); Cal. Sen. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 3 (Aug. 25, 2004).

In enacting the force-feeding ban, California also considered a study conducted by the European Union's Scientific Committee on Animal Health and an Israeli Supreme Court decision.  The European Union study concluded that force-feeding is detrimental to the welfare of birds, and the Israeli Supreme Court similarly concluded that force-feeding causes birds pain and suffering.  Cal. Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 6–7 (June 20, 2004); Cal. Sen. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003–2004 Reg. Sess., at 7–8 (May 6, 2004).  In light of these and other factors, California decided to enact the ban, joining a growing list of countries around the world.[1]

California's legislature intended to ban not foie gras itself, but rather the practice of producing foie gras by force-feeding.  The law's author, Senator John Burton, made clear when he introduced the bill that it "has nothing to do . . . with banning foie gras" and that it prohibits only the "inhumane force feeding [of] ducks and geese."  Then-Governor Arnold

---

[1] The following countries have instituted some form of a ban on force-feeding or foie gras products: Italy, the Netherlands, the Czech Republic, India, Luxembourg, Denmark, Finland, Norway, Poland, Israel, Sweden, Switzerland, Germany, and the United Kingdom.  *See, e.g.*, Cal. Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003-2004 Reg. Sess., at 6 (June 20, 2004); Atish Patel, *India Bans Import of Controversial Foie Gras*, Wall St. J.: India Real Time (July 7, 2014, 7:59 PM), https://blogs.wsj.com/indiarealtime/2014/07/07/india-bans-import-of-controversial-foie-gras/; Michaela DeSoucey, Contested Tastes: Foie Gras and the Politics of Food 61 (2016).

Schwarzenegger echoed this sentiment in his signing statement: "This bill's intent is to ban the current foie gras production practice of forcing a tube down a bird's throat to greatly increase the consumption of grain by the bird. It does not ban the food product, foie gras." Signing Message of Governor Arnold Schwarzenegger, Sen. Bill 1520, 2003–2004 Reg. Sess. (Sept. 29, 2004). The legislature provided more than seven and a half years between the passage of the law and its effective date to allow producers to transition to producing foie gras without force-feeding. *Id.*; *see* Cal. Health & Safety Code § 25984(a) (This law "shall become operative on July 1, 2012.").

## B. The PPIA

Originally enacted in 1957, the PPIA was intended to ensure that the nation's poultry products "are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451; *see Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 909 (D.C. Cir. 2015) (discussing Congress's intent to protect consumer health and welfare by ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged." (quoting 21 U.S.C. § 451)). The PPIA accomplishes this goal by, *inter alia*, authorizing the inspection of slaughterhouses and poultry-processing plants, 21 U.S.C. § 455, setting proper sanitation requirements, *id.* § 456, authorizing the Secretary of the U.S. Department of Agriculture ("USDA") to establish labeling and container standards, *id.* § 457, prohibiting the sale of adulterated, misbranded, or uninspected poultry products, *id.* § 458, establishing record-keeping requirements, *id.* § 460, and instituting storage and handling regulations, *id.* § 463. *See also Levine v. Vilsack*, 587 F.3d 986, 989 (9th Cir. 2009).

In 1968, Congress passed the Wholesome Poultry Products Act, which amended the PPIA "to provide for cooperation with appropriate State agencies with respect to State poultry products inspection programs, and for other purposes." Pub. L. No. 90-492, 82 Stat. 791 (1968); *see also* H.R. Rep. No. 90-1333, at 2 (1968), *reprinted in* 1968 U.S.C.C.A.N. 3426, 3426–27. The 1968 amendment also added an express preemption clause to the PPIA, which states that "[m]arking, labeling, packaging, or *ingredient requirements . . . in addition to, or different than*, those made under [the PPIA] may not be imposed by any State." 21 U.S.C. § 467e (emphasis added). At issue here is whether California's ban on products made by force-feeding birds constitutes an "ingredient requirement" under the PPIA's preemption clause.

## C.  Procedural History

Initially, Plaintiffs claimed that section 25982 violates the Due Process Clause and the dormant Commerce Clause of the U.S. Constitution. The district court denied Plaintiffs' request to enjoin California from enforcing section 25982, *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris*, No. 12-CV-05735, 2012 WL 12842942 (C.D. Cal. Sept. 28, 2012), and we affirmed the district court's ruling, *Canards I*, 729 F.3d at 942. The issue of preemption was not before us in *Canards I*.

On remand, Plaintiffs amended their complaint to allege that section 25982 is preempted by the PPIA. California moved to dismiss the complaint, and Plaintiffs moved for summary judgment on their preemption claim, arguing that the PPIA both expressly and impliedly preempts section 25982. The district court denied the State's motion to dismiss and granted Plaintiffs' motion for summary judgment. It found that section 25982 imposes an

"ingredient requirement" and is expressly preempted by the PPIA. *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Harris* (*Canards II*), 79 F. Supp. 3d 1136, 1144–48 (C.D. Cal. 2015). The district court permanently enjoined California from enforcing section 25982. *Id.* at 1148.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *Lee v. ING Groep, N.V.*, 829 F.3d 1158, 1160 (9th Cir. 2016). Viewing the evidence in the light most favorable to the nonmoving party, we must determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. *Oswalt v. Resolute Indus., Inc.*, 642 F.3d 856, 859 (9th Cir. 2011). We also review de novo questions of preemption and statutory interpretation. *See, e.g.*, *Aguayo v. U.S. Bank*, 653 F.3d 912, 917 (9th Cir. 2011).

## III. DISCUSSION

Plaintiffs invoke three separate preemption doctrines in support of their view that the state ban on the sale of foie gras produced by force-feeding methods cannot be enforced. First, they argue that the federal PPIA expressly preempts section 25982 because it imposes an "ingredient requirement" on the production of foie gras. Second, relying on the doctrine of implied preemption, Plaintiffs contend that Congress intended to comprehensively regulate the field of poultry products and thus left no room for state laws such as section 25982. Finally, Plaintiffs argue that implied preemption also applies because section 25982 stands as an obstacle to the purpose of PPIA. We address each of Plaintiffs' arguments in turn.

## A.  Express Preemption

Plaintiffs' main argument, and the ground upon which the district court granted summary judgment, is that California's sales ban is expressly preempted because the PPIA prohibits states from imposing "ingredient requirements" that are "in addition to, or different than," the federal law and its regulations.  21 U.S.C. § 467e.

In determining whether section 25982 is preempted by the PPIA, Congress's intent "is the ultimate touchstone." *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)).  Where the federal statute contains an express preemption clause, we must determine the substance and scope of the clause.  *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008).  In so doing, we assume "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."  *Lohr*, 518 U.S. at 485 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).  And finally, "when the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily 'accept the reading that disfavors pre-emption.'"  *Altria Grp., Inc.*, 555 U.S. at 77 (quoting *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005)).

We begin by noting two points of agreement between the parties.  First, Plaintiffs do not dispute that California's historic police powers extend to issues of animal cruelty.  *See Canards I*, 729 F.3d at 952 (citing *United States v. Stevens*, 559 U.S. 460, 469 (2010)); *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) (highlighting that protecting animals, like safeguarding the health and safety of citizens, is a legitimate state interest).  Because animal cruelty is a field traditionally regulated by the states, compelling evidence of an intention to preempt is required.  *See Lohr*,

518 U.S. at 485.  Second, the parties also agree that Congress intended to preempt state laws regulating the *ingredients* of poultry products.  The only dispute is whether California's sales ban imposes an "ingredient requirement" that is "in addition to, or different than, those made under [the PPIA]." 21 U.S.C. § 467e.

Plaintiffs argue that section 25982 imposes an "ingredient requirement" because it requires that foie gras be made only from the livers of birds who were not force-fed. Plaintiffs do not claim that foie gras produced from non-force-fed birds is in any way inferior to foie gras made from the livers of force-fed birds, only that federal law is silent on the former.  The State counters that section 25982 does not address ingredients at all, but rather regulates California's market by proscribing the sale of products produced by force-feeding birds to enlarge their livers.  And to the extent that section 25982 can be construed as a ban on foie gras itself, the State argues that the PPIA does not prevent a state from banning poultry products.  Based on the ordinary meaning of "ingredient" and the plain language and purpose of the PPIA, we hold that section 25982 is not expressly preempted by the PPIA.

1.  *"Ingredient Requirements" Refers to the Physical Composition of Poultry Products*

We must first determine the scope and substance of the PPIA's "ingredient requirements."  *Altria Grp., Inc.*, 555 U.S. at 76.  Because the PPIA does not define the term "ingredient," we look to the ordinary meaning of the term. *See, e.g.*, *Sandifer v. U.S. Steel Corp.*, 134 S. Ct. 870, 876 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979))).

"Ingredient" is defined as "one of the foods or liquids that you use in making a particular meal."  Macmillan English Dictionary 776 (2nd ed. 2007); *see also* New Oxford American Dictionary 893 (3rd ed. 2010) ("any of the foods or substances that are combined to make a particular dish"); Webster's New World Dictionary 248 (mod. desk ed. 1979) ("any of the things that make up a mixture; component"). Accordingly, the term "ingredient" as used in the PPIA is most naturally read as a physical component of a poultry product.

This reading of "ingredient" also draws support from the statutory scheme as a whole.  *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 70 (2011); Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 70, 167 (2012) ("Context is the primary determinant of meaning.").  For example, the PPIA allows the import of foreign poultry products only if, *inter alia*, the products "contain no dye, chemical, preservative, or ingredient which renders them unhealthful, unwholesome, adulterated, or unfit for human food."  21 U.S.C. § 466.  Similarly, the PPIA's "Definitions" section contains phrases such as: "ingredients only in a relatively small proportion"; "to assure that the poultry ingredients in such products are not adulterated"; "common names of optional ingredients (other than spices, flavoring, and coloring) present in such food"; and "fabricated from two or more ingredients."  21 U.S.C. § 453.  Only a physical component can be added in "relatively small proportion," "adulterated," or "fabricated" in the manner described in the PPIA.  In addition, regulations implementing the PPIA use the term "ingredient" in a manner consistent with its ordinary meaning.  *See, e.g.*, 9 C.F.R. § 424.21 (approving a chart of ingredients, including:  acidifiers, antifoaming agents, artificial sweeteners, food binders and extenders, coloring agents, and

proteolytic enzymes). The consistent usage of "ingredient" in the PPIA and its implementing regulations further confirms that the term is used to mean a physical component of a product. *See Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (We ordinarily assume "that identical words used in different parts of the same act are intended to have the same meaning." (quoting *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007))).

Congress made clear that the PPIA's "ingredient requirements" address the physical components of poultry products, not the way the animals are raised. *See Wyeth*, 555 U.S. at 565 (emphasizing that "the purpose of Congress is the ultimate touchstone in every pre-emption case" (quoting *Lohr*, 518 U.S. at 485)). The PPIA regulates "ingredient requirements" for the purpose of ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451; *see id.* § 452 (declaring Congressional policy of preventing distribution of "poultry products which are adulterated or misbranded"); *see also Armour & Co. v. Ball*, 468 F.2d 76, 80–81 (6th Cir. 1972) (explaining the purpose of "ingredient requirements" within the Federal Meat Inspection Act's ("FMIA") identical preemption clause). The PPIA therefore authorizes the USDA, acting through its Food Safety and Inspection Service ("FSIS"), to prescribe standards of identity or composition for poultry products. 21 U.S.C. § 453(h)(7); 9 C.F.R. § 381.155(a)(1). These "ingredient requirements" cannot be read to reach animal husbandry practices because the federal law "*does not regulate in any manner the handling*, shipment, or sale *of live poultry*." H.R. Rep. No. 85-465 at 1 (1957), *reprinted in* 1957

U.S.C.C.A.N. 1630, 1630 (emphasis added).**[2]**   The USDA has even represented in legal filings that "[t]he PPIA is wholly silent on the treatment of farm animals, (including feeding procedures) or methods of slaughter for poultry." Motion for Summary Judgment, at 2, *Animal Legal Def. Fund v. USDA*, No. 12-cv-04028 (C.D. Cal. Apr. 22, 2016), ECF No. 67; *id* at 3 ("[The FSIS] has no authority to regulate the care or feeding of birds prior to their arrival at the slaughter facility." (citing Decl. of Alice M. Thaler, Senior Director for Program Services in the Office of Public Health Science, FSIS, USDA, at ¶¶ 6–7, *Animal Legal Def. Fund v. USDA*, No. 12-cv-04028 (C.D. Cal. Nov. 28, 2012), ECF No. 26-1)).**[3]**     Accordingly, the PPIA's "ingredient requirements" are limited to the physical components of poultry products and do not reach the subjects of animal husbandry or feeding practices.

The ordinary meaning of "ingredient" (in line with the statutory context and the presumption of consistent usage) and the purpose and scope of the PPIA together make clear that "ingredient requirements" pertain to the physical components that comprise a poultry product, not animal husbandry or feeding practices.   Having determined the

---

**[2]** Although 21 U.S.C. § 453(g)(2)(A) makes a passing reference to "live poultry," it does so only in the context of explaining circumstances in which a final poultry product could be deemed adulterated.

**[3]** We again reject Plaintiffs' assertion that the USDA's Policy Book *requires* foie gras to come from force-fed birds.  *Canards I*, 729 F.3d at 950 ("It says nothing about the force feeding of geese and ducks."). Moreover, the background memos and letters on which Plaintiffs rely are "couched in tentative and non-committal terms."  *Reid v. Johnson & Johnson*, 780 F.3d 952, 965 (9th Cir. 2015).  The USDA has explicitly stated that the PPIA does not address the treatment of farm animals (including feeding procedures) and, based on the plain language and purpose of the law, we agree.

parameters of the PPIA's "ingredient requirements," we now turn to whether section 25982 can be construed as imposing an "ingredient requirement."

### 2. *California Law Does Not Impose a Preempted Ingredient Requirement*

California's ban on the in-state sale of foie gras produced by force-feeding contrasts starkly with the PPIA's conception of "ingredient requirements." Section 25982 does not require that foie gras be made with different animals, organs, or physical components. Nor does it require that foie gras consist of a certain percentage of bird liver. *Cf. Armour & Co.*, 468 F.2d at 80–81 (holding that a state law requiring a 12% protein content in sausage meat was preempted because, *inter alia*, federal regulations required only an 11.2% protein content). It simply seeks to prohibit a feeding method that California deems cruel and inhumane. Section 25982 therefore addresses a subject entirely separate from any "ingredient requirement": how animals are treated long before they reach the slaughterhouse gates.

Plaintiffs argue that while section 25982 may not appear to be an "ingredient requirement," the law functions as one because it requires the production of foie gras using non-force-fed, rather than force-fed, livers.[4] As an initial matter, it is not the livers that are force-fed, it is the birds. Regardless, Plaintiffs' reading of the PPIA would require us to radically expand the ordinary meaning of "ingredient." The difference between foie gras produced with force-fed birds and foie gras produced with non-force-fed birds is not

---

[4] Nearly all of the cases that Plaintiffs cite in their brief are irrelevant to the issue of "ingredient requirements" because they deal with other portions of the PPIA's preemption clause.

one of ingredient.  Rather, the difference is in the treatment of the birds *while alive*.  "Force-fed" is not a physical component that we find in our poultry; it is a feeding technique that farmers use.  The same logic applies to the difference between regular chicken and cage-free chicken.  "Cage-free" is no more an "ingredient" than "force-fed."  Although Plaintiffs invite us to expand the definition of "ingredients" to include animal husbandry practices, that is within Congress's bailiwick, not ours.  *See, e.g.*, *Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1725 (2017) ("And while it is of course our job to apply faithfully the law Congress has written, it is never our job to rewrite a constitutionally valid statutory text under the banner of speculation about what Congress might have done had it faced a question that, on everyone's account, it never faced.").  The PPIA, which is silent on the topic of animal husbandry and feeding practices, may not be read to supplant state law on an entirely different topic.  *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517, 523 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted.").

Alternatively, Plaintiffs argue that section 25982 is functionally a ban on *all* foie gras.  According to Plaintiffs, section 25982 bans the "ingredient" of foie gras because it bans the *process* by which it is made, i.e. force-feeding.  This argument fails for two independent reasons.  First, nothing in the record before us shows that force-feeding is *required* to produce foie gras.  The district court assumed, without deciding, that alternative methods of producing foie gras are available. [5]  *Canards II*, 79 F. Supp. 3d at 1145 n.8.  And as

---

[5] Plaintiffs do not appear to dispute that alternative methods of producing foie gras are available.  In fact, it appears that high-quality

noted above, California never intended to ban foie gras entirely—only foie gras produced by force-feeding. *See* Signing Message of Governor Arnold Schwarzenegger, Sen. Bill 1520, 2003–2004 Reg. Sess. (Sept. 29, 2004); *Canards I*, 729 F.3d at 945 n.4 ("Section 25982, however, does not prohibit foie gras. It bans the sale of foie gras produced through force feeding, but would not ban foie gras produced through alternative methods."); Cal. Health & Safety Code § 25984 (providing an effective date over seven and a half years after passage so that producers could transition to alternative methods of producing foie gras). Section 25982 therefore precludes only Plaintiffs' preferred method of producing foie gras.

Moreover, even if section 25982 results in the total ban of foie gras regardless of its production method, it would still not run afoul of the PPIA's preemption clause. The PPIA targets the slaughtering, processing, and distribution of poultry products, 21 U.S.C. §§ 451–452, but it does not mandate that particular types of poultry be produced for people to eat. Its preemption clause regarding "ingredient requirements" governs only the physical composition of poultry products. Nothing in the federal law or its implementing regulations limits a state's ability to regulate the *types* of poultry that may be sold for human consumption. If foie gras is made, producers must, of

---

foie gras can be made without force-feeding birds. *See, e.g.*, Dan Barber, *A foie gras parable*, TED, July 2008, *available at* http://www.ted.com/talks/dan_barber_s_surprising_foie_gras_parable /transcript?language=en#t-98000; Lauren Frayer, *This Spanish Farm Makes Foie Gras Without Force-Feeding*, NPR: The Salt (Aug. 1, 2016, 4:27 PM), http://www.npr.org/sections/thesalt/2016/08/01/487088946/t his-spanish-farm-makes-foie-gras-without-force-feeding (noting that the farmer's natural foie gras "won the Coup de Coeur, a coveted French gastronomy award (it's like the Olympics for foodies)").

course, comply with the PPIA.  But if a state bans a poultry product like foie gras, there is nothing for the PPIA to regulate.  The fact that Congress established "ingredient requirements" for poultry products that *are* produced does not preclude a state from banning products—here, for example, on the basis of animal cruelty—well before the birds are slaughtered.

Our conclusion here is consistent with rulings in both the Fifth and Seventh Circuits.  In *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, the Fifth Circuit examined whether the FMIA's identical preemption clause was triggered by a Texas law that banned horsemeat.  476 F.3d 326, 333–35 (5th Cir. 2007).  The court explained that the FMIA's preemption clause governs matters such as "meat inspection and labeling requirements.  It in no way limits states in their ability to regulate what types of meat may be sold for human consumption in the first place." *Id.* at 333. Because the FMIA does not limit a state's ability to define which meats are available for human consumption, the court found that the federal law could not preempt Texas's horsemeat ban.  *Id.*

Several months later, the Seventh Circuit reached the same conclusion.  In *Cavel International, Inc. v. Madigan*, the plaintiff argued that the FMIA's preemption clause swept aside state laws that banned the slaughter of horses for human consumption.  500 F.3d 551, 553 (7th Cir. 2007). The Seventh Circuit determined that this "argument confuses a premise with a conclusion." *Id.* The court explained:

> When the [FMIA] was passed (and indeed to this day), it was lawful in some states to produce horse meat for human consumption, and since the federal government has a

> legitimate interest in regulating the production of human food whether intended for domestic consumption or for export . . . it was natural to make the Act applicable to horse meat. That was not a decision that states must allow horses to be slaughtered for human consumption. The government taxes income from gambling that violates state law; that doesn't mean the state must permit the gambling to continue. *Given* that horse meat is produced for human consumption, its production must comply with the Meat Inspection Act. But if it is not produced, there is nothing, so far as horse meat is concerned, for the Act to work upon.

*Id.* at 553–54. Like the Fifth Circuit, the Seventh Circuit found that the FMIA is concerned with inspecting facilities at which meat is produced for human consumption, not "preserving the production of particular types of meat for people to eat." *Id.* at 554 (quoting *Empacadora de Carnes de Fresnillo*, 476 F.3d at 333).

Like the state bans on horsemeat in *Empacadora de Carnes de Fresnillo* and *Cavel*, section 25982 is not preempted by the PPIA even if it functions as a total ban on foie gras.[6]  Presumably, Congress could have authorized

---

[6] Section 25982 was inspired, in part, by California's own ban on horsemeat. *See* Cal. Assemb. Comm. on Bus. & Professions, Analysis of S.B. 1520, 2003-2004 Reg. Sess., at 7 (June 20, 2004) (noting that there is only a small step between a ban on horse, cat, and dog meat and a ban on force-feeding birds). As societal values change, so too do our notions of acceptable food products. Like foie gras, horsemeat was once a delicacy. *Cavel*, 500 F.3d at 552. Today, many states, including California, ban horsemeat because they consider the idea of eating horse

force-fed bird products, but "Congress did not write the statute that way." *United States v. Naftalin*, 441 U.S. 768, 773 (1979); *see also Dodd v. United States*, 545 U.S. 353, 359 (2005) ("[W]e are not free to rewrite the statute that Congress has enacted.").

Instead of addressing *Empacadora de Carnes de Fresnillo* and *Cavel*, Plaintiffs rely on the Supreme Court's decision in *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012). This case, however, bears little resemblance to *National Meat*. The California statute at issue in *National Meat* governed the slaughter of nonambulatory pigs. 565 U.S. at 455. In order to ensure that slaughterhouses handled nonambulatory pigs in a particular way, the state statute included a sales ban on selling meat or products from such pigs. *Id.* at 463–64.

The Supreme Court in *National Meat* found that the state statute was preempted because it regulated matters that fall within the heart of the FMIA's regulatory scope: the activities of slaughterhouses. According to the Court, the state law interfered in the operations of slaughterhouses, imposing requirements regarding the treatment of nonambulatory pigs that did not exist under the federal law and its regulations. *Id.* at 460–64 (emphasizing that the nonambulatory pig statute "functions as a command to

---

repugnant. *See id.*; Cal. Penal Code §§ 598c-598d. California, like a growing number of countries around the world, has concluded that force-fed foie gras is similarly repugnant. The PPIA and its preemption clause do not stand in the way of society's evolving standards regarding animal treatment. *Cf. Stevens*, 559 U.S. at 469 ("[T]he prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies."); *see generally* Emily Stewart Leavitt, *Animals and Their Legal Rights: A Survey of American Laws from 1641 to 1990* 1-47 (4th ed. 1990).

slaughterhouses [on how] to structure their operations"). The Court explained that while "a slaughterhouse may take one course of action in handling a nonambulatory pig" under the FMIA and its implementing regulations, "under state law the slaughterhouse must take another [course of action]." *Id.* at 460. In distinguishing the nonambulatory pig law from the horsemeat bans in *Empacadora de Carnes de Fresnillo* and *Cavel*, the Court underscored that the horsemeat bans "work[] at a remove from the sites and activities that the FMIA most directly governs." *Id.* at 467. Unlike the horsemeat cases, the Court found that the nonambulatory pig statute "reaches into the slaughterhouse's facilities and affects its daily activities." *Id.* The Court thus concluded that the FMIA preempted California's nonambulatory pig statute.

*National Meat* does not apply here because it addressed a different preemption argument in the context of a very different state law.[7] As an initial matter, *National Meat* and the present case deal with different portions of the FMIA's and PPIA's parallel preemption clauses; while *National Meat* focused exclusively on the "premises, facilities and operations" portion of the FMIA's preemption clause, Plaintiffs here invoke only the "ingredient requirements" portion of the PPIA's preemption clause. Moreover, section 25982, like the horsemeat bans in *Empacadora de Carnes de Fresnillo* and *Cavel*, "works at a remove from the sites and activities that the [PPIA] most directly governs." *Nat'l Meat Ass'n*, 565 U.S. at 467. Section 25982 also does not reach

---

[7] We also note that, unlike the FMIA at issue in *National Meat*, the PPIA does not explicitly incorporate the Humane Methods of Slaughter Act. We have not had the occasion to decide whether poultry should be considered "other livestock" under the Humane Methods of Slaughter Act, *see* 7 U.S.C. § 1902(a), and we need not decide that issue here.

into a poultry "slaughterhouse's facilities and affect[] its daily activities." *Id.* We therefore hold that the PPIA does not expressly preempt California Health and Safety Code section 25982.

## B. Implied Preemption

Alternatively, Plaintiffs argue that the PPIA impliedly preempts section 25982 under the doctrines of field and obstacle preemption. Neither doctrine, however, applies here.

Under the doctrine of field preemption, "States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). Courts may infer field preemption from a framework of regulation so pervasive "that Congress left no room for the States to supplement it" or where the federal interest is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Id.* (quoting *Rice*, 331 U.S. at 230); *see English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). Plaintiffs concede that the PPIA does not regulate the field of animal care and feeding, but view the PPIA as broadly occupying the field of all edible products that result from raising poultry for food.

Plaintiffs' field preemption argument ignores the states' role in poultry regulation. *Cf. Arizona*, 567 U.S. at 401 ("Field preemption reflects a congressional decision to foreclose any state regulation in the area, *even if it is parallel to federal standards*." (emphasis added)); *Campbell v. Hussey*, 368 U.S. 297, 330 (1961) (finding a state law preempted because the federal law does not allow even "complementary" or "supplement[al]" state requirements).

The express preemption clause at the heart of Plaintiffs' case clearly provides that the PPIA "shall not preclude any State . . . from making requirement[s] or taking other action, consistent with [the PPIA], with respect to any other matters regulated under [it]." 21 U.S.C. § 467e; *see also Bates*, 544 U.S. at 447. It also explains that state laws regarding storage and handling are preempted *only if* the Secretary of Agriculture finds those laws to "unduly interfere with the free flow of poultry products in commerce . . . ." *Id.* In addition, states may implement standards for the inspection of poultry sold in-state, even if those standards are more rigorous than the ones imposed by federal law. *Miss. Poultry Ass'n v. Madigan*, 31 F.3d 293, 296 (5th Cir. 1994) (en banc) ("Principles of federalism . . . led Congress to choose not to displace state inspection programs. Instead, Congress in these amendments created a complex 'marbled cake' scheme . . . ." (citing 21 U.S.C. § 454(a)) (footnote omitted)). Because the PPIA itself contemplates extensive state involvement, Congress clearly did not intend to occupy the field of poultry products. *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 334 ("Congress did not intend to preempt the entire field of meat commerce under the FMIA.").

Plaintiffs' theory of obstacle preemption fares no better. Obstacle preemption, which is a form of conflict preemption, occurs "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399–400 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects . . . ."). As with express preemption, courts "assume that

'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'"  *Arizona*, 567 U.S. at 400 (quoting *Rice*, 331 U.S. at 230).

Plaintiffs fail to explain how section 25982 stands as an obstacle to the PPIA's objectives of ensuring that poultry products are "wholesome, not adulterated, and properly marked, labeled, and packaged."  21 U.S.C. § 451; *see also* 21 U.S.C. § 452.  The PPIA most directly regulates "official establishments," where the "inspection of the slaughter of poultry, or the processing of poultry products," occurs. 21 U.S.C. § 453(p); *see* 9 C.F.R. § 381.1; *see also Nat'l Meat Ass'n*, 565 U.S. at 467 (noting that the FMIA most directly governs establishments where slaughtering and processing occurs).  Section 25982, in contrast, prohibits what California finds to be a cruel feeding practice that occurs far away from the official establishments that the PPIA regulates.  *See Empacadora de Carnes de Fresnillo*, 476 F.3d at 334–35.  Moreover, nothing in section 25982 interferes with the USDA's "authority to inspect poultry producers for compliance with health and sanitary requirements, require[] inspection of poultry after slaughter, establish[] labeling requirements for poultry products, [or] allow[] for withdrawal of inspections for noncompliance and the imposition of civil and criminal penalties for the sale of adulterated products."  *Levine*, 587 F.3d at 989 (citing 21 U.S.C. §§ 455–57, 461).  As the Supreme Court has cautioned, we should not "seek[] out conflicts between state and federal regulation where none clearly exists." *English v. Gen. Elec. Co.*, 496 U.S. at 90 (quoting *Huron Portland Cement Co. v. Detroit*, 362 U.S. 440, 446 (1960)). Accordingly, we conclude that section 25982 does not stand as an obstacle to accomplishing the PPIA's purposes.

## IV. Conclusion

Because Health and Safety Code section 25982 is not preempted by the PPIA, California is free to enforce it.  We **REVERSE** the district court's grant of summary judgment, **VACATE** the district court's permanent injunction, and **REMAND** the case for further proceedings consistent with this opinion.