**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ASSOCIATION DES ÉLEVEURS DE CANARDS ET D'OIES DU QUÉBEC, a Canadian nonprofit corporation; HVFG, LLC, a New York limited liability company; SEAN CHANEY, an individual, *Plaintiffs-Appellees/ Cross-Appellants,* <br><br> v. <br><br> ROB BONTA,[*] in his official capacity as Attorney General of California, *Defendant-Appellant/ Cross-Appellee.* | Nos. 20-55882 <br> 20-55944 <br><br> D.C. No. 2:12-cv-05735-SVW-RZ <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Stephen V. Wilson, District Judge, Presiding

Argued and Submitted October 18, 2021
Pasadena, California

Filed May 6, 2022

---

[*] Rob Bonta has been substituted for his predecessor, Xavier Becerra, as California Attorney General under Fed. R. App. P. 43(c)(2).

Before:  Andrew J. Kleinfeld, Ryan D. Nelson, and
Lawrence VanDyke, Circuit Judges.

Opinion by Judge R. Nelson;
Partial Concurrence and Partial Dissent by Judge VanDyke

---

## SUMMARY**

---

### Civil Rights

The panel affirmed the district court's dismissal of plaintiffs' preemption and dormant Commerce Clause claims and its summary judgment in favor of plaintiffs on a declaratory judgment claim in an action brought by various foie gras sellers challenging California's ban on the in-state sale of products that are "the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."  Cal. Health & Safety Code § 25982.

The panel held that the sales ban was neither preempted nor unconstitutional and that certain out-of-state sales were permitted by California law.

The panel assumed without deciding that California's sales ban prohibits all foie gras sales in California.  The panel then rejected plaintiffs' impossibility preemption challenge asserting that the sales ban was preempted because it was impossible to comply with both California law and the federal Poultry Products Inspection Act ("PPIA"), 21 U.S.C.

---

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

§ 451. The panel held that even assuming guidance from the United States Department of Agriculture requires foie gras to be produced by force feeding, the sellers could still force feed birds to make their products. They just could not sell those products in California. The sales ban was neither a command to market non-force-fed products as foie gras nor to call force-fed products something different.

The panel held that the district court did not abuse its discretion by denying plaintiffs leave to amend to add a new express ingredient preemption claim alleging that the sales ban operates as an "ingredient requirement" by prohibiting foie gras as an ingredient in other poultry products. The panel held that this court already rejected a critical premise of that claim in *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1145–53 (9th Cir. 2017) ("*Canards II*"), which was binding.

Rejecting plaintiffs' dormant Commerce Clause claim, the panel held that California's sales ban prohibits only in-state sales of foie gras, so it was not impermissibly extraterritorial even if it influenced out-of-state producers' conduct. The panel further rejected plaintiffs' claim that the sales ban unduly burdened interstate commerce, determining that the sales ban was neither discriminatory nor was inherently unduly burdensome.

The panel next considered California Attorney General's cross-appeal from the declaratory judgment order which construed the sales ban to allow online, phone and fax sales to California buyers when title passes outside the state. The panel held that plaintiffs had standing to assert the claim; that the district court properly permitted out-of-state sales; and the district court did not err by rejecting the Attorney General's view that a sale occurs when a consumer takes

possession of a product. The panel agreed with a California Court of Appeal's conclusion that the California Uniform Commercial Code provides a "reasonable" definition of "sale" for purposes of the sales ban.

Concurring in part and dissenting in part, Judge VanDyke agreed with the majority that the district court properly interpreted California Health & Safety Code § 25982 to permit sales from out-of-state vendors and that there was no standing issue preventing declaratory judgment. He therefore joined those sections of the majority opinion. But Judge VanDyke could not join the majority in rejecting plaintiffs' impossibility preemption claim and upholding the district court's denial of plaintiffs' motion to add an express preemption claim. Judge VanDyke wrote that ultimately, the PPIA and § 25982 require foie gras to be produced through mutually exclusive and irreconcilable methods. When this conflict arises, the constitutional controversy is not solved simply by saying the regulated entity should stop selling. Rather, the Constitution demands that the state law yield to federal law, and that is what was required here. Judge VanDyke further wrote that this Court's decision in *Canards II* explicitly depended on multiple assumptions about facts or issues not proven in the record at that time—including whether foie gras could be produced without force-feeding—and plaintiffs had now presented undeniable evidence showing those assumptions were mistaken.

**COUNSEL**

Peter H. Chang (argued), Deputy Attorney General; Mark R. Beckington, Supervising Deputy Attorney General; Thomas S. Patterson, Senior Assistant Attorney General; Rob Bonta, Attorney General; Office of the Attorney General, San Francisco, California; for Defendant-Appellant/Cross-Appellee.

Michael Tenenbaum (argued), Office of Michael Tenenbaum, Santa Monica, California, for Plaintiffs-Appellees/Cross-Appellants.

**OPINION**

R. NELSON, Circuit Judge:

California prohibits the in-state sale of products that are "the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size."  Cal. Health & Safety Code § 25982.  After nine years of litigation and in their third set of appeals before this Court, the parties ask us to decide whether California's sales ban is preempted by the Poultry Products Inspection Act ("PPIA") or violates the dormant Commerce Clause.  If the ban is not preempted or unconstitutional, they ask us to clarify whether it permits certain internet, phone, and fax sales by out-of-state sellers. We hold that the sales ban is neither preempted nor unconstitutional and that the specified transactions are out-of-state sales permitted by California law.

I

In 2004, California passed a law targeting the practice of force feeding ducks or geese to produce foie gras.  The law

worked through two provisions.  The first prohibited force feeding a bird "for the purpose of enlarging the bird's liver beyond normal size."  Cal. Health & Safety Code § 25981.  The second banned the in-state sale of products that are "the result of" that practice.  *Id.* § 25982.  The law provided a seven-and-a-half-year grace period for producers to transition away from force feeding before it went into effect.  *Id.* § 25984.

At the end of the grace period, various foie gras sellers sued to enjoin enforcement of the sales ban provision.  Since then, we have considered their arguments that the sales ban violates the Due Process Clause or is preempted by federal law under express, field, or obstacle preemption theories.  *See Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 946–47 (9th Cir. 2013) ("*Canards I*"); *Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1145–53 (9th Cir. 2017) ("*Canards II*") (rejecting prior express and implied preemption arguments following summary judgment).  Following those decisions, the sellers returned to district court to add an impossibility preemption claim, a claim under the dormant Commerce Clause, and a claim for declaratory relief (clarifying that out-of-state sellers could sell foie gras to California buyers over the internet, phone, or fax).  After further development of the record, they also sought to add an express ingredient preemption claim.

The district court denied leave to add the new express ingredient preemption claim and dismissed the impossibility preemption and dormant Commerce Clause claims.  *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, No. 2:12-CV-05735-SVW-RZ, 2020 WL 595440, at *6 (C.D. Cal. Jan. 14, 2020).  But it granted summary judgment to the sellers on their declaratory judgment claim, construing the

sales ban to allow online, phone, and fax sales to California buyers when title passes outside the state. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, No. 2:12-CV-05735-SVW-RZ, 2020 WL 5049182, at *5 (C.D. Cal. July 14, 2020).

Both sides object to the district court's latest decisions. California's Attorney General appeals the declaratory judgment order, challenging the sellers' standing and arguing that the specified transactions are prohibited. For their part, the sellers cross-appeal the dismissal of their preemption and dormant Commerce Clause claims. They argue that it is impossible to comply with both California law and the PPIA and that the sales ban regulates extraterritorial conduct and unduly burdens interstate commerce. They also contend that they should have been allowed to add their express ingredient preemption claim.

## II

We review de novo the district court's order granting a motion to dismiss for failure to state a claim, taking as true all allegations of material fact and construing them in the light most favorable to the nonmoving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). We review the district court's denial of leave to amend for abuse of discretion. *Brown v. Stored Value Cards, Inc.*, 953 F.3d 567, 573 (9th Cir. 2020).

We review de novo the district court's order granting summary judgment and "determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008) (citation omitted). The scope of a statute is a

question of law, which we also review de novo. *Canards I*, 729 F.3d at 945 (quoting *In re Lieberman*, 245 F.3d 1090, 1091 (9th Cir. 2001)).

"When interpreting state law, we are bound to follow the decisions of the state's highest court, and when the state supreme court has not spoken on an issue, we must determine what result the court would reach based on state appellate court opinions, statutes and treatises." *Diaz v. Kubler Corp.*, 785 F.3d 1326, 1329 (9th Cir. 2015) (quotation marks and brackets omitted).

## III

We first discuss the sellers' cross-appeal, which raises two preemption questions. The first is whether the sales ban is preempted because it is impossible to comply with both the PPIA and California law. The second is whether the district court should have granted leave to amend because the record now shows that the sales ban forbids the sale of all foie gras and therefore imposes an "ingredient requirement" that is "in addition to, or different than" those under federal law and regulations. *See* 21 U.S.C. § 467e. Both questions turn on the sellers' assertion that it is physically impossible to produce foie gras without force feeding. We assume without deciding they are correct that the sales ban prohibits all foie gras sales in California.

Preemption is rooted in the "fundamental principle of the Constitution . . . that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). It comes in three forms: express preemption, field preemption, and conflict preemption. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1022 (9th Cir. 2013). Express preemption arises "when the text of a federal statute explicitly manifests Congress's intent to displace

state law." *Id.* (citation omitted). Field and conflict preemption, on the other hand, are types of implied preemption. Field preemption prohibits state regulation of "conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 399 (2012)). And even where Congress has not occupied the field, conflict preemption arises when state law conflicts with a federal statute. *Id.* at 1023 (quoting *Crosby*, 530 U.S. at 372). Impossibility preemption—a form of conflict preemption—occurs when "it is impossible for a private party to comply with both state and federal law." *Id.* (quoting *Crosby*, 530 U.S. at 372).

## A

The sellers first argue that the sales ban is preempted because it is impossible to comply with both California law and the PPIA. In their view, they cannot comply with the sales ban if federal law requires foie gras to be produced via force feeding. They contend that the sales ban is a mandate that foie gras not include force-fed products and therefore their only option is to withdraw from the market. They then point to the Supreme Court's decision in *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013), to argue that a state law is preempted if it requires producers to stop selling their products.

The PPIA is a federal law that protects consumers by ensuring that "poultry products . . . are wholesome, not adulterated, and properly marked, labeled, and packaged." 21 U.S.C. § 451. It authorizes the Secretary of Agriculture to prescribe "definitions and standards of identity or

composition [f]or articles" within its scope. *Id.* § 457(b).[1] According to the sellers, those "definitions and standards" require foie gras to be produced by force feeding because the USDA defines foie gras as liver from poultry that has been "specially fed and fattened." They do not find that definition in the text of the PPIA or in a regulation, adopted by notice and comment, with the force of law. But at least one USDA Policy Book, expressly adopted as guidance, defines foie gras as "liver . . . obtained exclusively from specially fed and fattened geese and ducks," and other USDA documents support the proposition that a "specially fed and fattened" bird is one that has been force fed.

Unfortunately for the sellers, the definition of foie gras is beside the point: it is not impossible to produce foie gras in accordance with a USDA Policy Book just because force-fed products cannot be sold in California. Even assuming the USDA guidance requires force feeding, the sellers can still force feed birds to make their products. They just cannot sell those products in California. The sales ban is neither a command to market non-force-fed products as foie gras nor to call force-fed products something different.

---

[1] USDA regulations authorize the Administrator of the Food Safety and Inspection Service

> to establish specifications or definitions and standards of identity or composition, covering the principal constituents of any poultry product with respect to which a specified name of the product or other labeling terminology may be used, whenever he determines such action is necessary to prevent sale of the product under false or misleading labeling.

9. C.F.R. § 381.155(a)(1).

The dissent contends that our reasoning draws the "production versus sales" distinction that the Supreme Court rejected in *National Meat Ass'n v. Harris*, 565 U.S. 452 (2012). To be sure, the Court has explained that states cannot enact preempted regulations under the guise of a sales ban. *Id.* at 463–64. But this case differs from *National Meat* in at least two important ways. First, *National Meat* was an express preemption case about the "operations" provision in another federal statute. *See id.* at 459–60. Second, the sales ban in this case works "at a remove" from the slaughterhouses implicated in *National Meat*. *See id.* at 467.

*National Meat* considered a California statute that (1) prohibited the sale of meat from "nonambulatory" animals and (2) required the animals' immediate euthanization. *Id.* at 458–59. Federal law explicitly preempted state regulation of slaughterhouse operations. After examining "how the prohibition on sales operates within [the California statute] as a whole," the Court held that "[t]he idea—and the inevitable effect—of the [sales ban] [wa]s to make sure that slaughterhouses remove nonambulatory pigs from the production process." *Id.* at 463–64. The California law was preempted not because it was a sales ban but because it operated as a "command to slaughterhouses to structure their operations." *Id.*

Here, the sellers invoke only the "ingredient requirements" provision of the PPIA's preemption clause. Of course, regulating how a food product is made could impact its physical composition. But California law is silent on what ingredients are needed to call a product foie gras. The sellers have not argued that the sales ban affects slaughterhouse operations like the sales ban challenged in *National Meat*. In fact, the Supreme Court differentiated the *National Meat* sales ban from laws like the one in this case.

*Id.* at 467.  When a sales ban "works at a remove" from the sites and activities directly governed by federal law and does not "reach[] into the slaughterhouse's facilities and affect[] its daily activities," it is not preempted on *National Meat*'s reasoning.  *See id.*

That leaves the sellers' argument that the sales ban forces them into the "stop-selling" solution rejected in another Supreme Court case.  *See Bartlett*, 570 U.S. at 488.   In *Bartlett*, the Supreme Court contemplated a New Hampshire law that allowed design-defect claims against drug manufacturers whose labels had been federally approved. The New Hampshire cause of action effectively required drug manufacturers to provide stronger safety warnings.  *Id.* at 475.   Meanwhile, federal law prohibited generic drug manufacturers from independently changing their labels.  *Id.* New Hampshire law thus imposed a duty on manufacturers *not* to comply with federal law.  *Id.*  The Court rejected the idea that such impossibility could be resolved by forcing a seller to cease selling its products.  *Id.* at 475–76.

Like their argument about *National Meat*, the sellers stretch the Supreme Court's reasoning too far.  *Bartlett* does not prohibit states from imposing regulations that might require a manufacturer to withdraw from the market; it merely rejects the "stop-selling" rationale as an escape hatch when state and federal law impose conflicting obligations. If, for example, federal law required foie gras to be from force-fed birds but California law required foie gras *not* to be from force-fed birds, producers could not comply with both state and federal law.  There is no such impossibility here.  Even if federal law requires foie gras to be the liver of force-fed birds, California says only that it may not be sold in the state.

In the dissent's view, any state law that prevented a manufacturer from selling its product would be preempted under *Bartlett*.  But *Bartlett* has never been read so broadly, as evidenced by the bans upheld in this and at least two other circuits.  *See Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1147 (9th Cir. 2015); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551, 554 (7th Cir. 2007); *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 334–35 (5th Cir. 2007).  In fact, federal appellate courts generally apply *Bartlett* only in the products liability context.  Confining *Bartlett* to those circumstances makes sense—conflict preemption first requires conflicting obligations under state and federal law.  Virtually every instance of conflict preemption could be resolved if a court ordered the affected parties to simply cease their activities; such an order would render impossibility preemption "all but meaningless." *Bartlett*, 570 U.S. at 488.

It is another thing entirely to forbid a state from prohibiting sales just because a federal agency has issued some guidance that addresses some aspect of a product.  If that were the case, several state sales bans would be preempted just because federal law touches the product in some way.  *See, e.g.*, Mich. Comp. Laws § 287.746 (sales ban on battery cage eggs); Colo. Rev. Stat. § 35-21-203(2)(a) (same); Mass. Gen. Laws ch. 148, § 39 (Massachusetts fireworks sales ban); 15 U.S.C. §§ 1261–1263 (requiring hazardous substances sold in interstate commerce and intended for household use to bear adequate cautionary labels).  *Bartlett* says that, when faced with conflicting state tort law and federal law, the courts cannot simply tell manufacturers to withdraw from the market.  That proposition does not erase states' authority to prohibit the sale of certain products within their borders.

## B

The sellers' contention that it is physically impossible to produce foie gras without force feeding also underlies their express preemption claim. They assert that the sales ban operates as an "ingredient requirement" by prohibiting foie gras as an ingredient in other poultry products (*e.g.*, torchon).

The district court did not abuse its discretion when it denied leave to amend. Even if the sellers' arguments about force feeding are correct, we have already rejected a critical premise of their claim.

In *Canards II*, we concluded that the sales ban is not an "ingredient requirement" preempted by the PPIA. 870 F.3d at 1146–52. We held that force feeding was not an "ingredient requirement" because ingredient requirements refer to "the physical components of poultry products, not the way the animals are raised." *Id.* at 1147–48. We then addressed the argument that the sales ban is functionally a ban on all foie gras. *Id.* at 1149–50. We decided that it "fail[ed] for two independent reasons." *Id.* at 1149. The first was that nothing in the record showed "that force-feeding is *required* to produce foie gras." *Id.* That reason no longer applies because the record now includes evidence to that effect. But *Canards II* also concluded that "even if section 25982 results in the total ban of foie gras regardless of its production method, it would still not run afoul of the PPIA's preemption clause." *Id.* at 1150.

The sellers urge us to reconsider because they have now established the impossibility of non-force-fed foie gras—an "essential factual premise" missing in the earlier appeal. But these facts are immaterial because our decision in *Canards II* did not depend on that premise and is binding. Even if the

sales ban prohibits all foie gras sales, it is not a preempted "ingredient requirement" because federal law

> does not mandate that particular types of poultry be produced for people to eat . . . . Nothing in the federal law or its implementing regulations limits a state's ability to regulate the *types* of poultry that may be sold for human consumption. If foie gras is made, producers must, of course, comply with the PPIA. But if a state bans a poultry product like foie gras, there is nothing for the PPIA to regulate.

*Id.* at 1150. The sellers do not advance any new argument that could prevail given that holding. *See Chappel v. Lab'y Corp. of Am.*, 232 F.3d 719, 725–26 (9th Cir. 2000) (no abuse of discretion when amendment would be futile).

The dissent calls our *Canards II* decision dicta that we can revisit because the sellers have produced new evidence. Dissent 36–40. But *Canards II* did not rely on the possibility of producing foie gras without force feeding, so the new evidence does not displace our prior decision. As for the dissent's characterization of that decision, *Canards II*'s alternative holding cannot be dismissed as dicta. *See Woods v. Interstate Realty Co.*, 337 U.S. 535, 537 (1949) ("[W]here a decision rests on two or more grounds, none can be relegated to the category of *obiter dictum*."). As a published decision of this court, it controls as law of the circuit. *See Gonzalez v. Arizona*, 677 F.3d 383, 389 n.4 (9th Cir. 2012) (en banc), *aff'd sub nom. Arizona v. Inter Tribal Council of*

*Ariz., Inc.*, 570 U.S. 1 (2013).[2]   The dissent believes "the panel in *Canards II* engaged in flawed analysis," Dissent 28, and new evidence might present a "more difficult question" than the one presented in the sellers' prior petition for certiorari, Dissent 38.   Neither is a basis for us to ignore binding precedent.   Because another panel has already answered the relevant question, that precedent must be followed unless overruled by a body competent to do so. *Gonzalez*, 677 F.3d at 389 n.4.[3]

C

The sellers also cross-appeal the dismissal of their dormant Commerce Clause claim.   They argue that the sales ban is unconstitutional because it (1) impermissibly regulates out-of-state commerce and conduct and (2) unduly burdens interstate commerce.

The dormant Commerce Clause stems from our understanding that the Commerce Clause "implicitly preempt[s] state laws that regulate commerce in a manner that is disruptive to economic activities in the nation as a

---

[2] Moreover, *Canards II*'s decision is law of the circuit, "regardless of whether it was in some technical sense 'necessary' to our disposition of the case."   *See Barapind v. Enomoto*, 400 F.3d 744, 751 (9th Cir. 2005) (en banc).

[3] The dissent also argues that we should go beyond the legislative text to assume California is trying to ban foie gras without explicitly doing so.   Our assumption about the sales ban's effect does not assume California's purpose in passing the law.   In any event, it is not our place to stray from the text and guess at lawmakers' intent.   "We are governed by laws, not by the intentions of legislators . . . .   The law as it passed is the will of the majority . . . *and the only mode in which that will is spoken is in the act itself.*"   *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring) (internal quotation marks omitted).

whole." *Nat'l Pork Producers Council v. Ross*, 6 F.4th 1021, 1026 (9th Cir. 2021), *cert. granted*, No. 21-438, 2022 WL 892100, at *1 (Mar. 28, 2022) (citing *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090 (2018)).  "[T]wo primary principles . . . mark the boundaries of a State's authority." *Wayfair*, 138 S. Ct. at 2090.  "First, state regulations may not discriminate against interstate commerce; and second, States may not impose undue burdens on interstate commerce." *Id.* at 2091.  A state law may also violate the dormant Commerce Clause when it (1) has extraterritorial effects, *Nat'l Pork Producers Council*, 6 F.4th at 1026 (citing *Wayfair*, 138 S. Ct. at 2091), or (2) regulates activities that are "inherently national or require a uniform system of regulation," *id.* at 1031 (quoting *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019)).

State laws that effectively burden only out-of-state businesses (because there are no comparable in-state businesses) are not necessarily discriminatory.  *See Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 119–26 (1978).  The sellers do not argue against the sales ban on that basis.  Instead, they argue that the sales ban is extraterritorial in its "practical effect" and burdens interstate commerce in a way that is "clearly excessive in relation to [its] putative local benefits." *See Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1149 (9th Cir. 2012) (quoting *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)).[4]

---

[4] The sellers also argue that California's sales ban regulates inherently national activities.  To be sure, foie gras *labeling* is subject to an inherently national or uniform system of regulation; to qualify as foie gras, a product must satisfy USDA standards.  But the sellers do not identify federal regulation of foie gras *sales*.  Ultimately, federal

i

The sellers argue that the sales ban is impermissibly extraterritorial because force feeding is banned in California, *see* Cal. Health & Safety Code § 25981, and therefore the sales ban regulates only out-of-state conduct.

Although "[s]tates may not mandate compliance with their preferred policies in wholly out-of-state transactions, . . . they are free to regulate commerce and contracts within their boundaries with the goal of influencing the out-of-state choices of market participants." *Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1103 (9th Cir. 2013). States are thus free to regulate in-state sales without such regulation being unconstitutional for its extraterritorial effect. *See Nat'l Pork Producers Council*, 6 F.4th at 1029 (citing *Rosenblatt*, 940 F.3d at 445). California's sales ban prohibits only in-state sales of foie gras, *Canards I*, 729 F.3d at 949, so it is not impermissibly extraterritorial even if it influences out-of-state producers' conduct.

This conclusion is supported by our reasoning in *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608 (9th Cir. 2018). In that case, California attempted "to reach beyond [its] borders . . . and control transactions that occur wholly outside of the State after the material in question . . . ha[d] been removed from the State." *Id.* at 615. Although we enjoined enforcement of the law in *Daniels Sharpsmart*, we clarified that we were not concerned about "an attempt . . . to protect California and its residents by applying [state law] to

_____

regulation of one aspect of a good does not establish a uniform system of regulation of all aspects of that good. *See, e.g.*, *Chinatown Neighborhood*, 794 F.3d at 1147 (shark fin sales ban did not interfere with an activity that was inherently national or required a uniform system of regulation, despite federal regulation of fisheries).

products that are brought into or are otherwise within the borders of the State." *Id.* Unlike the law in that case, the sales ban does not affect transactions outside California.[5]

ii

The sellers also contend that the sales ban unduly burdens interstate commerce. The district court disagreed, determining the sellers had shown no cognizable burden on interstate commerce and recognizing California's legitimate local interest in "public health," *Canards*, 2020 WL 5049182, at *2 n.1, and "[p]reventing animal cruelty," *Canards*, 2020 WL 595440, at *3.

State laws that "regulat[e] even-handedly to effectuate a legitimate local public interest . . . will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Wayfair*, 138 S. Ct. at 2091 (quoting *Pike*, 397 U.S. at 142). Although we have not identified every way a burden can be "clearly excessive," our precedent "preclude[s] any judicial assessment of the benefits of a state law and the wisdom in adopting it unless the state statute either discriminates in favor of in-state commerce or imposes a significant burden on interstate

---

[5] The distinction between in-state and out-of-state regulations is also apparent in cases from other circuits. The Seventh Circuit enjoined enforcement of an Indiana law that directly regulated operations in out-of-state manufacturing plants. *See Legato Vapors, LLC v. Cook*, 847 F.3d 825 (7th Cir. 2017). And the Fourth Circuit invalidated a law that directly controlled out-of-state transactions. *See Ass'n for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018).

commerce." *Chinatown Neighborhood*, 794 F.3d at 1146 (quotation marks, brackets, and ellipsis omitted).[6]

The sales ban is not discriminatory, so the statute does not impose an undue burden on that basis. *Canards I*, 729 F.3d at 948. And we have rejected the notion that sales bans are inherently unduly burdensome. In *Chinatown Neighborhood*, we held that a California law prohibiting in-state shark fin sales did not unduly burden interstate commerce when weighed against California's interest in "prevent[ing] animal cruelty." 794 F.3d at 1147. We are not alone; the Fifth and Seventh Circuits similarly upheld laws banning the sale or importation of horse meat. *Empacadora*, 476 F.3d at 336–37; *Cavel Int'l*, 500 F.3d at 559.

In a final attempt to resurrect their dormant Commerce Clause claim, the sellers assert that California can "convey[] its distaste for foie gras" in less burdensome ways. But the dormant Commerce Clause does not impose a "least burdensome" requirement for state laws. *See Canards I*, 729 F.3d at 953 (quoting *Nat'l Ass'n of Optometrists*, 682 F.3d at 1157) ("'[F]or us to invalidate a statute based on the availability of less burdensome alternatives, the statute would have to impose a significant burden on interstate commerce,' which is not the case here."). We decline the invitation to wade into murky policy waters.

D

For his part, the Attorney General contests two sellers' standing and argues that the sales ban prohibits out-of-state

---

[6] A state's interest in "prevent[ing] animal cruelty" is a "legitimate matter[] of local concern," even when that cruelty takes place outside the state. *See Chinatown Neighborhood*, 794 F.3d at 1147.

vendors' sales to California buyers, even when order and payment is processed outside the state and the only in-state conduct is third-party delivery to (or transportation by) the consumer.  We reject both arguments.

i

The Attorney General challenges the standing of two sellers—the Canadian Association ("Association") and restauranteur Sean "Hot" Chaney—because they have not alleged that they sell (or plan to sell) foie gras to California buyers.  According to the Attorney General, Association members do not directly sell foie gras to California buyers— instead, they sell to out-of-state third-party sellers who then sell to consumers.  As for Chaney, the Attorney General argues that the restauranteur does not sell foie gras from outside California and Chaney's purported interest in purchasing foie gras is outside the scope of the declaratory claim.

In cases involving multiple plaintiffs, "[a]t least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1647 (2017).  To establish standing, a plaintiff must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Ctr. for Biological Diversity v. Mattis*, 868 F.3d 803, 816 (9th Cir. 2017) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), *as revised* (May 24, 2016)).

The Attorney General's challenge fails because the third seller, whose standing he does not contest, has standing to seek declaratory relief.  Hudson Valley Foie Gras LLC ("Hudson Valley") is a limited liability corporation that

produces foie gras in New York and sells foie gras online. Its website server is located outside California. Purchases are processed by a third-party processor outside California then received at Hudson Valley's bank in New York. Orders are fulfilled and products are delivered to third-party shipping companies in New York facilities. Only then do third-party shippers deliver Hudson Valley's foie gras to buyers. As a result of the sales ban, Hudson Valley has been forced to stop accepting purchases from any buyer with a California address. In fact, California District Attorneys have threatened prosecution against Hudson Valley if they sell to California consumers. Hudson Valley has therefore alleged a sufficient injury in fact traceable to the Attorney General's enforcement of the sales ban and redressable by a declaratory order clarifying the scope of California law. The district court's declaratory relief describes a group of sales allowed under California law; it does not award damages or afford other relief unique to any plaintiff.

The record also establishes standing for at least one of the challenged sellers. As an organization, the Association has standing to sue on behalf of its members when "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Ecological Rts. Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (quoting *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977)). The Association's interest in protecting its members' foie gras sales is germane to its purpose and no claim asserted or relief requested requires member participation. Because Palmex, a member of the

Association, has alleged that it sells foie gras in the United States, the Association has standing.[7]

ii

The Attorney General also makes several arguments about the scope of the sales ban.  He contends that the district court should not have used the definition provided in the California Uniform Commercial Code (UCC) to permit sales where:

> [1] The Seller is located outside of California[;]
>
> [2] The foie gras being purchased is not present within California at the time of sale[;]
>
> [3] The transaction is processed outside of California (via phone, fax, email, website, or otherwise)[;]
>
> [4] Payment is received and processed outside of California[;] and
>
> [5] The foie g[r]as is given to the purchaser or a third-party delivery service outside of California, and "[t]he shipping company [or purchaser] thereafter transports the product to the recipient designated by the purchaser," even if the recipient is in California.

---

[7] Given that two sellers have standing, we need not consider Chaney's.

*Canards*, 2020 WL 5049182, at \*5.  In the Attorney General's view, the sales ban prohibits sales to California consumers regardless of seller location.  But because the ban prohibits certain products from being "sold in California," the question is not where a seller is located but where a sale occurs.

The California Supreme Court has not yet decided what constitutes a sale under the sales ban, so we must predict how it would answer the question.  When interpreting state law, California courts look "to the plain meaning of the statutory language, then to its legislative history and finally to the reasonableness of a proposed construction."  *Riverview Fire Prot. Dist. v. Workers' Comp. Appeals Bd.*, 28 Cal. Rptr. 2d 601, 605 (1994).

In a different case involving this sales ban, the California Court of Appeal looked to the UCC to define "sale."  *Animal Legal Def. Fund v. LT Napa Partners LLC*, 184 Cal. Rptr. 3d 759, 771, 773 (2015) (citing Cal. Com. Code § 2106 (sale occurs where title passes)); *see also* Cal. Com. Code § 2401(2).  It explained that the UCC provided "a reasonable general definition" for the term, *Animal Legal Def. Fund*, 184 Cal. Rptr. 3d at 771 (citing *Merriam-Webster's Collegiate Dictionary* 1028 (10th ed. 2001)), and noted that another California law also defined "sale" as a transaction "in which title . . . is passed," *id.* at 772.

The Attorney General contends that this definition does not apply because the UCC cannot "impair or repeal any statute regulating sales to consumers, farmers or other specified classes of buyers."  Cal. Com. Code § 2102.  But the sales ban does not define "sale," and the UCC definition cannot "impair or repeal" language that does not exist.

In the Attorney General's view, other parts of the Health and Safety Code suggest a sale occurs when a consumer takes possession of the product.  He first points to California's Shelled Egg Laws, which ban the in-state sale of shelled eggs from hens confined in a manner that violates specified animal care standards.  Cal. Health & Safety Code § 25996.  We have recognized that California's Shelled Egg Laws apply to "all eggs sold in California"; the Attorney General contends that this language proves that out-of-state sellers are not excluded from the sales ban.  *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 650 (9th Cir. 2017).  To be sure, both the sales ban and the Shelled Egg Laws apply to all sales in California.  But this point confuses the issue: the district court's order does not exempt out-of-state sellers from California's sales ban.  *Canards*, 2020 WL 5049182, at *5.  Instead, it identifies out-of-state transactions that are not prohibited by California law.  *Id.*

The Attorney General next argues that the district court erred by comparing the sales ban to other sections of California's Health and Safety Code.  In particular, he argues that the district court improperly used those sections to infer that California did not reject the UCC definition.

After noting that the UCC does not override a provision of the sales ban, the district court recognized that California has defined sales in other sections of the Health and Safety Code.  *Canards*, 2020 WL 5049182, at *3–4 (discussing Cal. Health & Safety Code § 25991(o)).  To be sure, the *expressio unius* canon does not require us to reject definitions provided in parallel statutes just because they are absent from the sales ban.  But neither does it require us to use those definitions. The sales ban does not define sales and, absent language to the contrary, we follow the California Court of Appeal, *see*

*Animal Legal Def. Fund*, 184 Cal. Rptr. 3d at 773, and look to the reasonable definition provided by the UCC.

The Attorney General also contends that the district court's focus on payment processing imposes limitations not found in the sales ban's text or legislative history. In particular, he argues that "processing" does not determine the place of a sale and that, in the internet age, any sales ban permitting sales "processed" outside the state could be easily evaded. It is true that the sales ban does not mention "processing" of payments and transactions; it prohibits sales in California, regardless of seller location, payment processing, consumption, or possession. But the district court's language about "processing" merely limits its declaratory judgment to the facts presented and describes a category of transactions that occur outside California. It does not add conditions to what is prohibited by California law. And although the Attorney General correctly notes that the consummation of a sale provides "a sufficient nexus . . . to be treated as a local transaction taxable by th[e] State," that language discusses limitations on state and local taxation, not what constitutes a "sale" under state law. *See Wayfair*, 138 S. Ct. at 2092 (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184 (1995)).

The Attorney General finally argues that the declaratory judgment contradicts the legislature's intent in enacting the sales ban (*i.e.*, to "discourage the consumption of products produced by force feeding birds and prevent complicity in a practice . . . deemed cruel to animals," *Canards I*, 729 F.3d at 952), so any reasonable interpretation of the sales ban must prohibit direct sales to California buyers. But this argument is contradicted by the statutory text; there is no indication that the legislature intended to further its goal by banning consumption and possession of foie gras.

Policymakers' statements about force feeding and foie gras point to the legislature's general intent to prevent complicity in animal cruelty or California's position that a ban on force-fed products does not amount to a ban of foie gras. The sales ban presumably reflects the legislature's balancing of those goals with consumer costs. In any event, we agree with the California Court of Appeal's conclusion that the UCC provides a "reasonable" definition of "sale" for purposes of the sales ban. *Animal Legal Def. Fund*, 184 Cal. Rptr. 3d at 771.

IV

In conclusion, California's sales ban is neither preempted nor impermissible under the dormant Commerce Clause. The sellers have alleged standing to assert their declaratory judgment claim and the district court's order properly permits out-of-state sales.

**AFFIRMED.**

---

VANDYKE, Circuit Judge, concurring in part and dissenting in part.

I agree with the majority that the district court properly interpreted California Health & Safety Code § 25982 to permit sales from out-of-state vendors and that there is no standing issue preventing declaratory judgment, and therefore join those sections of the majority opinion. But I cannot join the majority in rejecting Plaintiffs' impossibility

preemption claim and upholding the district court's denial of Plaintiffs' motion to add an express preemption claim.[1]

California has prohibited the sale of any bird liver if that bird was force-fed, and the *only* way to make foie gras that complies with federal requirements is through force-feeding. This forces Plaintiffs into an impossible situation, and one in which the only solution is to stop selling any foie gras in California.   Although the majority deems this solution sufficient, the Supreme Court has held that market participants cannot be forced to "stop selling" when it is impossible to comply with conflicting state and federal requirements, and the majority's attempt to free itself from this clear command is unavailing.

The majority also rejects Plaintiffs' argument that § 25982 operates as an impermissible "ingredient requirement" that conflicts with federal requirements governing how to produce foie gras.  The majority does so by relying on this court's previous ruling in an earlier iteration of this litigation.  *See Ass'n des Éleveurs de Canards et d'Oies du Québec v. Becerra*, 870 F.3d 1140, 1146 (9th Cir. 2017) (*Canards II*).  But the *Canards II* decision explicitly depended on multiple assumptions about facts or issues not proven in the record at that time—including whether foie gras could be produced without force-feeding—and Plaintiffs have now presented undeniable evidence showing those assumptions were mistaken.  Relying on those assumptions, the panel in *Canards II* engaged in flawed analysis to deny Plaintiffs' claim by assuming that the process by which the birds are fed has no effect on the physical composition of the end

---

[1] Because I would hold that § 25982 is preempted by federal law, I would not reach Plaintiffs' dormant Commerce Clause challenge.

product.  That is simply not true on our record, as Plaintiffs have offered an abundance of evidence to prove that force-fed bird livers are chemically and physically different than non-force-fed bird livers in numerous respects.  All that notwithstanding, the majority still chooses to bind itself to *Canards II*.  Because that is not required by our caselaw and ignores essential developments in the litigation of this matter, I respectfully dissent.

## I.  Impossibility Preemption

The preemption doctrine is a natural outworking of our constitutional structure.  As the Supremacy Clause makes clear, "the Laws of the United States . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const., art. VI, cl. 2.  Therefore, "[w]here state and federal law directly conflict, state law must give way."  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (internal quotation marks and citation omitted).  Relevant for our purposes, "state and federal law conflict where it is 'impossible for a private party to comply with both state and federal requirements.'"  *Id.* at 618 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).

Plaintiffs argue that it is impossible to sell foie gras in California in a way that is consistent with both the Federal Poultry Products Inspection Act (PPIA) and § 25982.  The PPIA was enacted to ensure quality and uniformity among poultry products, and authorizes the Secretary of Agriculture to set forth "definitions and standards" of articles governed by the PPIA.  *See* 21 U.S.C. § 457(b).  The USDA has defined foie gras as "liver . . . obtained exclusively from specially fed and fattened geese and ducks," *see* UNITED STATES DEPARTMENT OF AGRICULTURE, FOOD STANDARDS AND LABELING POLICY BOOK (2005), and—as the majority

acknowledges—has elsewhere explained that "specially fed and fattened" means force-fed.  It is important to recognize that the federal government's definition of foie gras is inherently *process-based*.  Compliance with the federal definition of foie gras inevitably turns on *how* the foie gras was made.  If, for example, a company invented some method of modifying a bird liver posthumously so that it otherwise mirrored foie gras in every respect, that company would still *not* be able to label it as foie gras according to the federal requirements, because that bird was not "specially fed and fattened" as required by the federal definition of "foie gras."

This process-based definition is neither unique nor surprising.  The most commonplace example of this is probably the USDA's guidelines around organic foods.  As the USDA explains, "[t]he organic standards *are process-based*, meaning they establish the rules for an entire system of farming that follows a product from its beginnings on the farm all the way to retail."  United States Department of Agriculture, Organic 101: What Organic Farming (and Processing) Doesn't Allow (2017) (emphasis added).  As with foie gras, one cannot designate something as organic by examining only the end product, but rather must also know the process by which that product was produced.[2]

Once foie gras' federal definition is properly understood, the tension with California's § 25982 becomes clear.  Section 25982 is also a statute regulating the *process* of how foie gras must be made if it is to be sold in the state.  Again,

---

[2] To be clear, the process by which foie gras is created *does also* in fact affect the end product—something that may or may not be true to the same extent with all organic foods.  *See infra* Section II.

§ 25982 forbids the sale of any product in California "if it is the result of force feeding a bird for the purpose of enlarging the bird's liver beyond normal size." There is little dispute that this statute regulates process. *See Canards II*, 870 F.3d at 1144 ("California's legislature intended to ban not foie gras itself, but rather the practice of *producing foie gras by force-feeding*.") (emphasis added); *see also* Signing Message of Governor Arnold Schwarzenegger, Sen. Bill 1520, 2003–2004 Reg. Sess. (Sept. 29, 2004) ("This bill's intent is to ban the current foie gras production practice of forcing a tube down a bird's throat to greatly increase the consumption of grain by the bird. It does not ban the food product, foie gras."). Looking at the statutory text, I see no reason to dispute this understanding of the statute as articulated by the *Canards II* panel or California's then-governor. California's statute is therefore best understood as limiting acceptable foie gras to non-force-fed foie gras.

In short, the federal government has defined foie gras to mean specially fed and fattened (i.e., force-fed) goose and duck liver, while California has banned the sale of any foie gras produced by force-feeding the bird. This means there is no universe in which Plaintiffs can comply with both the PPIA and § 25982, because there is no universe in which Plaintiffs could follow California's requirement for acceptable foie gras while also meeting the federal definition of what foie gras is. And therefore, "under the Supremacy Clause, from which our pre-emption doctrine is derived, any state law . . . which interferes with or is contrary to federal law, must yield." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal quotation marks and citation omitted).

Perhaps what is most puzzling about the majority opinion is that my colleagues seem to agree with much of

what I just explained.  They write: "If, for example, federal law required foie gras to be from force-fed birds but California law required foie gras *not* to be from force-fed birds, producers could not comply with both state and federal law."  Unfortunately, "[w]hat the [majority] does not see is that *that is this case . . . .*"  *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 490 (2013).

As explained above, both premises of the majority's not so hypothetical hypothetical are true.  The federal definition does in fact require "foie gras to be from force-fed birds," and the California statute does in fact require "foie gras *not* to be from force-fed birds."  But despite these two realities, the majority still claims "[t]here is no such impossibility here.  Even if federal law requires foie gras to be the liver of force-fed birds, California says only that it may not be sold in the state."  The majority seemingly relies on the idea that there is no preemption issue because the PPIA regulates the process by which foie gras is made, while § 25982 is a sales ban.

But this line of reasoning has already been rejected by the Supreme Court.  In *National Meat Association v. Harris*, the Supreme Court held that a California law banning the *sale* of nonambulatory pigs (pigs that cannot walk) was preempted by the Federal Meat Inspection Act (FMIA), which regulated the *process* by which slaughterhouses handle and slaughter animals for consumption.  565 U.S. 452, 455 (2012).  The Supreme Court determined that the sales ban was preempted because it "imposes additional or different requirements on swine slaughterhouses" by forcing them to treat nonambulatory pigs differently than under federal law.  *Id.* at 460.  The same is true here, since § 25982 demands foie gras producers treat the birds differently than what the PPIA requires.

The majority distinguishes this case from *National Meat* by arguing in part that the "sales ban in this case works 'at a remove' from the slaughterhouses implicated in *National Meat*." But this argument has it backwards; § 25982 is in fact *more* intrusive on the foie gras sellers than the slaughterhouses in *National Meat*. The Supreme Court in *National Meat* examined the statute in question, which facially banned only the *sale* of nonambulatory pigs, and concluded that "[t]he idea—and the inevitable effect—of the provision is to make sure that slaughterhouses remove nonambulatory pigs from the production process . . . ." *Id.* at 464. The Supreme Court invalidated California's statute because the "sales ban" actually functioned "as a command to slaughterhouses to structure their operations in the exact way the [statute] mandates." *Id.* There is no such subterfuge here. California's § 25982 *overtly* regulates the process by which saleable foie gras can be produced. But the majority today rewards California for doing explicitly what the Supreme Court faulted it for doing implicitly: imposing state requirements on a process regulated by the federal law.

The majority also argues that *National Meat* is inapplicable because the statute here does not directly govern any aspects of the process regulated by federal law and "does not 'reach[] into the slaughterhouse's facilities and affect[] its daily activities'" because it bans only the sale of non-force-feed birds. But this argument is no different than the one the Supreme Court considered and rejected in *National Meat*. Defenders of California's law in *National Meat* argued that there was no preemption because the "ban on sales does not regulate a slaughterhouse's 'operations' because it kicks in only after they have ended: Once meat from a slaughtered pig has passed a post-mortem inspection, the Act 'is not concerned with whether or how it is ever actually sold.'" *Id.* at 463 (citation omitted). The Supreme

Court disagreed, reasoning that to accept this argument would mean that "any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.* at 464.    The Supreme Court also referenced another preemption case to conclude "it 'would make no sense' to allow state regulations to escape preemption because they addressed the purchase, rather than manufacture, of a federally regulated product." *Id.* (citing *Engine Mfrs. Ass'n. v. South Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004)).

*National Meat* makes clear that a state cannot sidestep a preemption issue simply by banning the sale of a certain good produced a certain way instead of directly banning the process itself.  *National Meat*'s practical rule would seem to apply a fortiori where the process by which the product is made is precisely how federal law *defines* the product that the state is attempting to partially ban.  This is exactly what California has done with § 25982, and therefore § 25982 should be treated the same as California's statute in *National Meat*.

Building off this logic, the majority leaves the sellers with one unenviable path forward: "[t]hey just cannot sell those products in California."   The problem with this supposed solution is that it too has already been flatly rejected by the Supreme Court.  In *Mutual Pharmaceutical Company v. Bartlett*, the Supreme Court examined a New Hampshire law that effectively required Mutual Pharmaceutical to offer a stronger warning label for a certain drug.  570 U.S. 472, 475 (2013).  Mutual argued that the New Hampshire law was preempted by the Federal Food, Drug, and Cosmetic Act, which prohibited Mutual from changing its drug label.  *Id.*  Given the impossibility of complying with

both the federal and state law, the First Circuit offered the same solution the majority offers today: "Mutual should simply have pulled [the drug] from the market in order to comply with both state and federal law . . . ." *Id.* The Supreme Court emphatically rejected this idea. "We reject this 'stop-selling' rationale as incompatible with our pre-emption jurisprudence." *Id.* at 488. Again, "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but meaningless.'" *Id.* (citation omitted). And finally:

> The incoherence of the stop-selling theory becomes plain when viewed through the lens of our previous cases. In every instance in which the Court has found impossibility pre-emption, the 'direct conflict' between federal-and state-law duties could easily have been avoided if the regulated actor had simply ceased acting.

*Id.*

The majority seeks to avoid this head-on collision with *Bartlett* by asserting that *Bartlett* "merely rejects the 'stop-selling' rationale as an escape hatch when state and federal law impose conflicting obligations." But even this narrow reading of *Bartlett* squarely governs the case before us, since the stop-selling rationale is in fact being used as the escape hatch to avoid the conflict between state and federal requirements governing the production of foie gras. And as our caselaw makes clear, the preemption doctrine is implicated *whenever* a state and federal law conflict. *Id.* at 490; *see also Maryland v. Louisiana*, 451 U.S. 725, 728 (1981) ("It is basic to [the Supremacy Clause] that *all*

conflicting state provisions be without effect.") (emphasis added).**[3]**

Ultimately, the PPIA and § 25982 require foie gras to be produced through mutually exclusive and irreconcilable methods.   When this conflict arises, the constitutional controversy is not solved simply by saying the regulated entity should stop selling.   Rather, the Constitution demands that the state law yield to federal law, and that is what is required here.

## II.  Express Preemption

The   harm   in   rejecting   Plaintiffs'   impossibility preemption claim is compounded by the fact that the majority also upholds the district court's denial of Plaintiffs' motion for leave to add a new express preemption claim. The PPIA's preemption clause ensures that "[m]arking, labeling, packaging, or ingredient requirements . . . in addition to, or different than, those made under this chapter may not be imposed by any State . . . ."  21 U.S.C. § 467e. In *Canards II*, Plaintiffs argued that California's ban on the sale   of   force-fed   birds   operated   as   an   "ingredient requirement" and was thus preempted by the PPIA.   The *Canards   II*   panel   disagreed,   holding   that   "'ingredient requirements'   pertain   to   the   physical   components   that

---

**[3]** The majority also argues that under my reading of *Bartlett*, "any state law that prevented a manufacturer from selling its product would be preempted under *Bartlett*."  My position is in fact far narrower than the majority alleges.  My argument is *not* that the states cannot ban the sale of a product if that product is regulated in any way imaginable by the federal government; rather, my argument is that the state cannot create an irresolvable conflict with federal law over how a product should be produced—a proposition firmly supported by *National Meat* and *Bartlett*.

comprise a poultry product, not animal husbandry or feeding practices." *Canards II*, 870 F.3d at 1148.

Both the district court and the majority today base their decisions largely on the fact that, because *Canards II* "already rejected a critical premise of their claim," plaintiffs are bound by that decision under the "law of the case" doctrine. "[U]nder the 'law of the case' doctrine, one panel of an appellate court will not as a general rule reconsider questions which another panel has decided on a prior appeal in the same case." *Merritt v. Mackey*, 932 F.2d 1317, 1320 (9th Cir. 1991) (citation omitted). However, "[t]he doctrine is discretionary, not mandatory." *Id.* And our circuit has explained that one situation where the law of the case doctrine should not bind a later panel is when "substantially different evidence was adduced at a subsequent trial." *Hegler v. Borg*, 50 F.3d 1472, 1475 (9th Cir. 1995). An abundance of new evidence has been produced in this case since *Canards II*, and therefore this panel should not handcuff itself to a prior, and now outdated, ruling.

Most importantly, the *Canards II* panel found that "nothing in the record before us shows that force-feeding is *required* to produce foie gras." *Canards II*, 870 F.3d at 1149. Unlike in *Canards II*, Plaintiffs in the record before us now have demonstrated that force-feeding *is* required to produce foie gras. This is critical because, as the United States Solicitor General observed in his brief before the Supreme Court recommending that the Supreme Court *not* grant review in *Canards II*, "[i]f in fact Section 25982 did operate to make unavailable in the State any poultry products containing foie gras—or perhaps a particular type of foie gras that was a materially distinct substance, physically or

chemically—it would present a more difficult question."[4]
Brief for the United States as Amicus Curiae at 14–15,
*Canards II*.  But the Solicitor General went on to recommend
that because the Plaintiffs in *Canards II* have not
"established that liver for foie gras cannot be produced by a
method other than force-feeding the geese or ducks," there
was no need to "resolve this difficult question" at that point.
*Id.* at 15–16.

Ignoring that this "more difficult question" is now
presented to this panel for the first time in this case, the
majority still finds the holding in *Canards II* binding because
the *Canards II* panel stated that "even if section 25982
results in the total ban of foie gras *regardless of its
production method*, it would still not run afoul of the PPIA's
preemption clause." *Canards II*, 870 F.3d at 1150 (emphasis
added).   But California's elected officials repeatedly
emphasized what is also crystal clear from the text of
§ 25982—that it does not ban foie gras "*regardless of its
production method*."  Section 25982 is concerned *only* with
the "production method" for foie gras, so *Canards II*'s
passing statement about a hypothetical situation present in

---

[4] The *Canards II* panel's conclusions appear to have been
inextricably tied to its now-inapt factual understanding that foie gras
could be produced without force-feeding.  During oral argument, many
of the questions centered around whether force-feeding was the
exclusive means of producing foie gras.  One of our colleagues asked
Plaintiffs' counsel, "for us to agree with you, we have to agree that the
only way that this product can be served in California is through force-
feeding, there is no other way to do it?"  Plaintiffs' counsel responded,
"I think if you agree with that, then it's automatically preempted and
there's not even a question."  Oral Arg. at 32:00–32:11, *Canards II*,
https://www.youtube.com/watch?v=WJerm_vEbE0&t=1785s.

neither *Canards II* nor our case cannot somehow control our analysis here.[5]

The record in our case is unambiguous: California purports to ban only *some* foie gras, and that ban is entirely tied to the production method for that foie gras.   As mentioned earlier, numerous California officials stressed this point at every stage of § 25982's deliberation and ratification.  Even the Senator who authored the bill stated as much, declaring that § 25982 "has nothing to do . . . with banning foie gras," but rather only preventing the "inhumane force feeding [of] ducks and geese."  *Id.* at 1144.  California itself reinforces this interpretation in its briefing before the court, repeatedly asserting that § 25982 is not a total foie gras ban.

The problem is not that California has directly enacted a "total ban of foie gras"—no one argues that it has.  The problem is that California has attempted to ban only one particular production method for foie gras (force-feeding), but that one production method is also precisely how federal law defines the ingredient foie gras, and there is no other way to make foie gras.  That express preemption claim was never squarely addressed in *Canards II*, because *Canards II* expressly assumed that force feeding was not the only way

---

[5] The majority argues that my position requires the panel to "ignore binding precedent," but this misses the point.  First, the majority transforms the law of the case doctrine from a discretionary doctrine to a categorical command in a way foreign to our own caselaw.  *See, e.g.*, *Merritt*, 932 F.2d at 1320.  But more importantly, my argument is *not* that we should disregard *Canard II* as non-binding dicta; my argument (as explained below) is that *Canards II*'s dicta is simply not applicable here.

to produce foie gras.  Plaintiffs should not be barred from having it addressed in the first instance now.

The majority similarly errs by relying on the *Canards II* dicta about whether a state can enact a "total ban" on some food product.  That dicta may very well be correct; perhaps California could directly ban all foie gras if it so chose.  *See Canards II*, 870 F.3d at 1150 (citing *Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326 (5th Cir. 2007) (upholding a total ban on horse meat); *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 551 (7th Cir. 2007) (same)).  But it is also completely irrelevant to this case.  As explained, the record is unmistakable that California has not attempted to enact a total ban on foie gras like some states did with horse meat.  And the fact that California might have the authority to *directly* ban all foie gras is factually and legally distinct from the question that Plaintiffs seek to present on remand in this case: whether California can attempt to ban *some* foie gras in a way that directly conflicts with the federal definition of what foie gras is, particularly when that is also the only way to make foie gras.

The majority seems to assume that if § 25982 would be constitutional if it was an *outright* foie gras ban, then it must also be constitutional if it is anything less stringent.  But in constitutional law, the greater power often does not include the lesser power.  *See, e.g.*, *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 513 (1996) ("[W]e think it equally clear that [Rhode Island's] power to ban the sale of liquor entirely does not include a power to censor all [liquor] advertisements . . . .  As the entire Court apparently now agrees, the [greater includes the lesser] statements . . . on which Rhode Island relies are no longer persuasive.").  Here, the fact that California might be able to directly ban foie gras altogether does not control whether it can enact an attempted

partial ban that runs headlong into the federal definition of how foie gras is defined.[6]

---

[6] The majority's rejection of Plaintiffs' preemption claims also has the unfortunate side effect of undermining political accountability. As California argued in its opening brief, the "Legislature enacted Section 25982 in part to discourage the consumption of force-fed foie gras." But the statute was obviously meant to discourage only the consumption of foie gras *produced a certain way*; it was not a ban on foie gras altogether. There could be numerous reasons why California's elected officials opted not to enact a total prohibition, including political compromise, lack of support for a direct total ban, countervailing considerations, etc. But the majority today ignores California's *limited* goal—clear from the face of § 25982 and reinforced by California's political branches at every turn. It instead analyzes the statute as if its conflict with federal law, and the effect of that conflict, was built directly into the state statute itself, so that the state statute *itself* is a total ban. In doing so, the majority disregards a key tenet of statutory interpretation: that "that the law's 'purpose,' properly understood, embodies not merely a statute's substantive ends (its 'ulterior purposes'), but also [the legislature's] specific choices about *the means* to carry those ends into effect (its 'implemental purposes')." John F. Manning, *The New Purposivism*, 2011 SUP. CT. REV. 113, 115 (2011) (footnote omitted). And in morphing this statute into something the legislature did not enact, the majority encourages future short-circuiting of the democratic process by the political branches (whether intentional or not). California's elected officials may be able to pass an outright foie gras ban if they desired, but they should be required to actually enact such a law and be held politically accountable for that decision. "When [the legislature] itself regulates, the responsibility for the benefits and burdens of the regulation is apparent. Voters who like or dislike the effects of the regulation know who to credit or blame." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461, 1477 (2018). California's voters have been denied the opportunity to do that here. The voters were repeatedly told § 25982 was not a total ban on foie gras and have presumably made their political decisions accordingly. But the majority's conclusion today blesses an outcome that the political officials may not have had the political will to enact, and in doing so, denies the people of California the ability to "know who to credit or blame" for the fact that they not only cannot buy foie gras from force-fed ducks, but they cannot buy any foie gras at all.

Put simply, the panel in *Canards II* reached its conclusion by relying on two assumptions: (1) there were other methods for producing foie gras besides force-feeding; and (2) even if § 25982 was hypothetically a complete ban unrelated to production methods, it would still be constitutional.  Neither of those assumption apply to the case before this panel, which presents a fact-pattern that the *Canards II* panel clearly *did not* consider—where force-feeding is the only method of production *and* § 25982 is not a complete ban on foie gras.  Because *Canards II* did not address this situation, it is yet another reason why the rule of the case doctrine does not apply.  *See Hegler*, 50 F.3d at 1475 ("Although the doctrine applies to a court's explicit decisions as well as those issues decided by necessary implication, it clearly does not extend to issues an appellate court did not address.") (citation omitted).

Once it is recognized that *Canards II*'s express preemption ruling was based on a factual record very different than the one *before us*, we must examine if § 25982 does in fact impermissibly add an ingredient requirement

---

Is that because of California's attempted *partial* ban on foie gras, or because of the federal definition of foie gras?  California voters should not have to speculate who is to blame for their deprived palate in this circumstance, because the direct conflict between the state and federal laws about how foie gras is produced should mean that the state law is preempted.

The majority's takeaway from this argument is that I am advocating we "should go beyond the legislative text to assume California is trying to ban foie gras without explicitly doing so."  Again, the majority has it exactly backwards.  The argument throughout my dissent is that the *legislative text* was clear: California enacted a law regulating the process by which foie gras was made, *not* an outright sales ban.  A simple reading of that statute, not any divination of the lawmaker's intent, is the only foundation needed to sustain my view.

that conflicts with federal law.  On the record before it, the *Canards II* panel argued the "ordinary meaning" of "ingredient" and the "statutory scheme as a whole" proves that the "'ingredient requirements' pertain to the physical components that comprise a poultry product, not animal husbandry or feeding practices."  870 F.3d at 1148.  But the expanded record in this case now shows that framing to be a false dichotomy.  As Plaintiffs have now established, feeding practices *do in fact* affect the physical components of foie gras.  The liver of a force-fed duck will be up to ten times larger, lighter in color, have a higher ratio of saturated fatty acids, as well as have a different texture, taste, and smell than the liver of a non-force-fed duck.  One doesn't need to be a chemist to see the obvious differences between the two:



**(non-force-fed liver)     (force-fed liver)**

So while *Canards II* may (or may not) have been correct to say that there is no physical difference "between regular chicken and cage-free chicken," *id.* at 1149, the same certainly cannot be said about "regular" duck liver and force-fed duck liver.

Given all the new evidence presented to this panel for this case, in addition to the outdated assumptions and erroneous reasoning offered in *Canards II*, I see no reason to bind ourselves to its conclusion on express preemption. I would therefore reverse the district court and allow Plaintiffs to add their express preemption claim.